ATWATER ET AL. *v.* CITY OF LAGO VISTA ET AL.

No. 99–1408.   Argued December 4, 2000—Decided April 24, 2001

320

*Robert C. DeCarli* argued the cause for petitioners. With him on the briefs were *Debra Irwin, Pamela McGraw,* and *Michael F. Sturley.*

*R. James George, Jr.,* argued the cause for respondents. With him on the brief were *William W. Krueger III* and *Joanna R. Lippman.*

*Gregory S. Coleman,* Solicitor General of Texas, argued the cause for the State of Texas et al. as *amici curiae* urging affirmance. With him on the brief were *John Cornyn,* Attorney General, *Andy Taylor,* First Assistant Attorney General, and *Lisa R. Eskow,* Assistant Attorney General, and the Attorneys General for their respective States as follows: *Mark Pryor* of Arkansas, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Carla J. Stovall* of Kansas, *J. Joseph Curran, Jr.,* of Maryland, *Joseph P. Mazurek* of Montana,

*W. A. Drew Edmondson* of Oklahoma, *Charles M. Condon* of South Carolina, and *Mark L. Earley* of Virginia.*

JUSTICE SOUTER delivered the opinion of the Court.

The question is whether the Fourth Amendment forbids a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine. We hold that it does not.

## I

## A

In Texas, if a car is equipped with safety belts, a front-seat passenger must wear one, Tex. Transp. Code Ann. § 545.413(a) (1999), and the driver must secure any small child riding in front, § 545.413(b). Violation of either provision is "a misdemeanor punishable by a fine not less than $25 or more than $50." § 545.413(d). Texas law expressly authorizes "[a]ny peace officer [to] arrest without warrant a person found committing a violation" of these seatbelt laws, § 543.001, although it permits police to issue citations in lieu of arrest, §§ 543.003–543.005.

In March 1997, petitioner Gail Atwater was driving her pickup truck in Lago Vista, Texas, with her 3-year-old son and 5-year-old daughter in the front seat. None of them was

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Susan N. Herman* and *Steven R. Shapiro;* for Americans for Effective Law Enforcement, Inc., by *Wayne W. Schmidt, James P. Manak,* and *Bernard J. Farber;* for the Cato Institute by *Timothy Lynch;* for the Institute on Criminal Justice at the University of Minnesota Law School et al. by *Richard S. Frase;* for the National Association of Criminal Defense Lawyers et al. by *Wesley MacNeil Oliver* and *Joshua Dratel;* and for the Texas Criminal Defense Lawyers Association by *Greg Westfall* and *William S. Harris.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Waxman, Assistant Attorney General Robinson, Deputy Solicitor General Dreeben,* and *Patricia A. Millett;* for the National League of Cities et al. by *Richard Ruda* and *James I. Crowley;* and for the Texas Police Chiefs Association by *James McLaughlin, Jr.*

wearing a seatbelt.   Respondent Bart Turek, a Lago Vista police officer at the time, observed the seatbelt violations and pulled Atwater over.   According to Atwater's complaint (the allegations of which we assume to be true for present purposes), Turek approached the truck and "yell[ed]" something to the effect of "[w]e've met before" and "[y]ou're going to jail."   App. 20.[1]   He then called for backup and asked to see Atwater's driver's license and insurance documentation, which state law required her to carry.   Tex. Transp. Code Ann. §§ 521.025, 601.053 (1999).   When Atwater told Turek that she did not have the papers because her purse had been stolen the day before, Turek said that he had "heard that story two-hundred times."   App. 21.

Atwater asked to take her "frightened, upset, and crying" children to a friend's house nearby, but Turek told her, "[y]ou're not going anywhere."   *Ibid.*   As it turned out, Atwater's friend learned what was going on and soon arrived to take charge of the children.   Turek then handcuffed Atwater, placed her in his squad car, and drove her to the local police station, where booking officers had her remove her shoes, jewelry, and eyeglasses, and empty her pockets.   Officers took Atwater's "mug shot" and placed her, alone, in a jail cell for about one hour, after which she was taken before a magistrate and released on $310 bond.

Atwater was charged with driving without her seatbelt fastened, failing to secure her children in seatbelts, driving without a license, and failing to provide proof of insurance. She ultimately pleaded no contest to the misdemeanor seatbelt offenses and paid a $50 fine; the other charges were dismissed.

---

[1] Turek had previously stopped Atwater for what he had thought was a seatbelt violation, but had realized that Atwater's son, although seated on the vehicle's armrest, was in fact belted in.   Atwater acknowledged that her son's seating position was unsafe, and Turek issued a verbal warning. See Record 379.

## B

Atwater and her husband, petitioner Michael Haas, filed suit in a Texas state court under 42 U. S. C. § 1983 against Turek and respondents City of Lago Vista and Chief of Police Frank Miller.   So far as concerns us, petitioners (whom we will simply call Atwater) alleged that respondents (for simplicity, the City) had violated Atwater's Fourth Amendment "right to be free from unreasonable seizure," App. 23, and sought compensatory and punitive damages.

The City removed the suit to the United States District Court for the Western District of Texas.   Given Atwater's admission that she had "violated the law" and the absence of any allegation "that she was harmed or detained in any way inconsistent with the law," the District Court ruled the Fourth Amendment claim "meritless" and granted the City's summary judgment motion.   No. A–97 CA 679 SS (WD Tex., Feb. 13, 1999), App. to Pet. for Cert. 50a–63a.   A panel of the United States Court of Appeals for the Fifth Circuit reversed.   165 F. 3d 380 (1999).   It concluded that "an arrest for a first-time seat belt offense" was an unreasonable seizure within the meaning of the Fourth Amendment, *id.*, at 387, and held that Turek was not entitled to qualified immunity, *id.*, at 389.

Sitting en banc, the Court of Appeals vacated the panel's decision and affirmed the District Court's summary judgment for the City.   195 F. 3d 242 (CA5 1999).   Relying on *Whren* v. *United States*, 517 U. S. 806 (1996), the en banc court observed that, although the Fourth Amendment generally requires a balancing of individual and governmental interests, where "an arrest is based on probable cause then 'with rare exceptions . . . the result of that balancing is not in doubt.'"   195 F. 3d, at 244 (quoting *Whren, supra,* at 817). Because "[n]either party dispute[d] that Officer Turek had probable cause to arrest Atwater," and because "there [was] no evidence in the record that Officer Turek conducted the arrest in an 'extraordinary manner, unusually harmful' to At-

water's privacy interests," the en banc court held that the arrest was not unreasonable for Fourth Amendment purposes. 195 F. 3d, at 245–246 (quoting *Whren, supra,* at 818).

Three judges issued dissenting opinions. On the understanding that citation is the "usual procedure" in a traffic stop situation, Judge Reynaldo Garza thought Atwater's arrest unreasonable, since there was no particular reason for taking her into custody. 195 F. 3d, at 246–247. Judge Weiner likewise believed that "even with probable cause, [an] officer must have a plausible, articulable reason" for making a custodial arrest. *Id.,* at 251. Judge Dennis understood the Fourth Amendment to have incorporated an earlier, common-law prohibition on warrantless arrests for misdemeanors that do not amount to or involve a "breach of the peace." *Ibid.*

We granted certiorari to consider whether the Fourth Amendment, either by incorporating common-law restrictions on misdemeanor arrests or otherwise, limits police officers' authority to arrest without warrant for minor criminal offenses. 530 U. S. 1260 (2000). We now affirm.

## II

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In reading the Amendment, we are guided by "the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing," *Wilson* v. *Arkansas,* 514 U. S. 927, 931 (1995), since "[a]n examination of the common-law understanding of an officer's authority to arrest sheds light on the obviously relevant, if not entirely dispositive, consideration of what the Framers of the Amendment might have thought to be reasonable," *Payton* v. *New York,* 445 U. S. 573, 591 (1980) (footnote omitted). Thus, the first step here is to assess Atwater's claim that peace officers' authority to make warrantless arrests for misdemeanors was

restricted at common law (whether "common law" is understood strictly as law judicially derived or, instead, as the whole body of law extant at the time of the framing). Atwater's specific contention is that "founding-era common-law rules" forbade peace officers to make warrantless misdemeanor arrests except in cases of "breach of the peace," a category she claims was then understood narrowly as covering only those nonfelony offenses "involving or tending toward violence." Brief for Petitioners 13. Although her historical argument is by no means insubstantial, it ultimately fails.

## A

We begin with the state of pre-founding English common law and find that, even after making some allowance for variations in the common-law usage of the term "breach of the peace,"[2] the "founding-era common-law rules" were not

---

[2] The term apparently meant very different things in different common-law contexts. For instance, under a statute enacted during the reign of Charles II forbidding service of any warrant or other court process on Sunday "except in cases of treason, felony or breach of the peace," 29 Car. II, ch. 7, §6, 8 Statutes at Large 414 (1676), "it was held that every indictable offense was constructively a breach of the peace," Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 574 (1924); see also *Ex parte Whitchurch*, 1 Atk. 56, 58, 26 Eng. Rep. 37, 39 (Ch. 1749). The term carried a similarly broad meaning when employed to define the jurisdiction of justices of the peace, see 2 W. Hawkins, Pleas of the Crown, ch. 8, §38, p. 60 (6th ed. 1787) (hereinafter Hawkins), or to delimit the scope of parliamentary privilege, see *Williamson* v. *United States*, 207 U. S. 425, 435–446 (1908) (discussing common-law origins of Arrest Clause, U. S. Const., Art. I, §6, cl. 1).

Even when used to describe common-law arrest authority, the term's precise import is not altogether clear. See J. Turner, Kenny's Outlines of Criminal Law §695, p. 537 (17th ed. 1958) ("Strangely enough what constitutes a 'breach of the peace' has not been authoritatively laid down"); G. Williams, Arrest for Breach of the Peace, 1954 Crim. L. Rev. 578, 578–579 ("The expression 'breach of the peace' seems clearer than it is and there is a surprising lack of authoritative definition of what one would suppose to be a fundamental concept in criminal law"); Wilgus, *supra*, at 573 ("What constitutes a *breach of peace* is not entirely certain"). More often

nearly as clear as Atwater claims; on the contrary, the common-law commentators (as well as the sparsely reported cases) reached divergent conclusions with respect to officers' warrantless misdemeanor arrest power. Moreover, in the years leading up to American independence, Parliament repeatedly extended express warrantless arrest authority to cover misdemeanor-level offenses not amounting to or involving any violent breach of the peace.

1

Atwater's historical argument begins with our quotation from Halsbury in *Carroll* v. *United States*, 267 U. S. 132 (1925), that

> " '[i]n cases of misdemeanor, a peace officer like a private person has at common law no power of arresting without a warrant except when a breach of the peace has been committed in his presence or there is reasonable ground for supposing that a breach of peace is about to be committed or renewed in his presence.' " *Id.*, at 157 (quoting 9 Halsbury, Laws of England § 612, p. 299 (1909)).

---

than not, when used in reference to common-law arrest power, the term seemed to connote an element of violence. See, *e. g.*, M. Dalton, Country Justice, ch. 3, p. 9 (1727) ("The Breach of th[e] Peace seemeth to be any injurious Force or Violence moved against the Person of another, his Goods, Lands, or other Possessions, whether by threatening words, or by furious Gesture, or Force of the Body, or any other Force used *in terrorem*"). On occasion, however, common-law commentators included in their descriptions of breaches of the peace offenses that do not necessarily involve violence or a threat thereof. See M. Hale, A Methodical Summary of the Principal Matters Relating to the Pleas of the Crown *134 (7th ed. 1773) ("Barretries"); 4 W. Blackstone, Commentaries on the Laws of England 149 (1769) (hereinafter Blackstone) ("[s]preading false news"). For purposes of this case, it is unnecessary to reach a definitive resolution of the uncertainty. As stated in the text, we will assume that as used in the context of common-law arrest, the phrase "breach of the peace" was understood narrowly, as entailing at least a threat of violence.

But the isolated quotation tends to mislead. In *Carroll* itself we spoke of the common-law rule as only "sometimes expressed" that way, 267 U. S., at 157, and, indeed, in the very same paragraph, we conspicuously omitted any reference to a breach-of-the-peace limitation in stating that the "usual rule" at common law was that "a police officer [could] arrest without warrant . . . one guilty of a misdemeanor if committed in his presence." *Id.*, at 156–157. Thus, what *Carroll* illustrates, and what others have recognized, is that statements about the common law of warrantless misdemeanor arrest simply are not uniform. Rather, "[a]t common law there is a difference of opinion among the authorities as to whether this right to arrest [without a warrant] extends to all misdemeanors." American Law Institute, Code of Criminal Procedure, Commentary to §21, p. 231 (1930).

On one side of the divide there are certainly eminent authorities supporting Atwater's position. In addition to Lord Halsbury, quoted in *Carroll*, James Fitzjames Stephen and Glanville Williams both seemed to indicate that the common law confined warrantless misdemeanor arrests to actual breaches of the peace. See 1 J. Stephen, A History of the Criminal Law of England 193 (1883) ("The common law did not authorise the arrest of persons guilty or suspected of misdemeanours, except in cases of an actual breach of the peace either by an affray or by violence to an individual"); G. Williams, Arrest for Breach of the Peace, 1954 Crim. L. Rev. 578, 578 ("Apart from arrest for felony . . . , the only power of arrest at common law is in respect of breach of the peace"). See also *Queen* v. *Tooley*, 2 Ld. Raym. 1296, 1301, 92 Eng. Rep. 349, 352 (Q. B. 1710) ("[A] constable cannot arrest, but when he sees an actual breach of the peace; and if the affray be over, he cannot arrest").

Sir William Blackstone and Sir Edward East might also be counted on Atwater's side, although they spoke only to the sufficiency of breach of the peace as a condition to warrant-

less misdemeanor arrest, not to its necessity. Blackstone recognized that at common law "[t]he constable . . . hath great original and inherent authority with regard to arrests," but with respect to nonfelony offenses said only that "[h]e may, without warrant, arrest any one for a breach of the peace, and carry him before a justice of the peace." 4 Blackstone 289. Not long after the framing of the Fourth Amendment, East characterized peace officers' common-law arrest power in much the same way: "A constable or other known conservator of the peace may lawfully interpose upon his own view to prevent a breach of the peace, or to quiet an affray . . . ." 1 E. East, Pleas of the Crown § 71, p. 303 (1803).

The great commentators were not unanimous, however, and there is also considerable evidence of a broader conception of common-law misdemeanor arrest authority unlimited by any breach-of-the-peace condition. Sir Matthew Hale, Chief Justice of King's Bench from 1671 to 1676,[3] wrote in his History of the Pleas of the Crown that, by his "original and inherent power," a constable could arrest without a warrant "for breach of the peace and some misdemeanors, less than felony." 2 M. Hale, Pleas of the Crown 88 (1736). Hale's view, posthumously published in 1736, reflected an understanding dating back at least 60 years before the appearance of his Pleas yet sufficiently authoritative to sustain a momentum extending well beyond the framing era in this country. See The Compleat Parish-Officer 11 (1744) ("[T]he Constable . . . may for Breach of the Peace, and some Misdemeanors less than Felony, imprison a Man"); R. Burn, The Justice of the Peace 271 (1837) ("A *constable* . . . may at common law, for treason, felony, breach of the peace, and some misdemeanors less than felony, *committed in his view,* apprehend the supposed offender without any warrant" (italics in original)); 1 J. Chitty, A Practical

---

[3] E. Foss, The Judges of England 113 (1864).

Treatise on the Criminal Law 20 (5th ed. 1847) ("[A constable] may for treason, felony, breach of the peace, and some misdemeanors less than felony, committed in his view, apprehend the supposed offender *virtiute officii*, without any warrant"); 1 W. Russell, Crimes and Misdemeanors 725 (7th ed. 1909) (officer "may arrest any person who in his presence commits a misdemeanor or breach of the peace").[4]

As will be seen later, the view of warrantless arrest authority as extending to at least "some misdemeanors" beyond breaches of the peace was undoubtedly informed by statutory provisions authorizing such arrests, but it reflected common law in the strict, judge-made sense as well, for such was the holding of at least one case reported before Hale had even become a judge but which, like Hale's own commentary, continued to be cited well after the ratification of the Fourth Amendment. In *Holyday* v. *Oxenbridge*, Cro. Car. 234, 79 Eng. Rep. 805 (1631), the Court of King's Bench held that even a private person (and thus *a fortiori* a peace officer[5]) needed no warrant to arrest a "common cheater" whom he discovered "cozen[ing] with false dice." The court expressly rejected the contention that warrantless arrests were improper "unless in felony," and said instead that "there was good cause [for] staying" the gambler and, more broadly, that "it is *pro bono publico* to stay such offenders." *Id.*, at 805–806. In the edition nearest to the date of the Constitution's framing, Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown generalized from *Holyday* that "from the reason of this case it seems to follow,

---

[4] Cf. E. Trotter, Seventeenth Century Life in the Country Parish: With Special Reference to Local Government 88 (1919) (describing broad authority of local constables and concluding that, "[i]n short, the constable must apprehend, take charge of and present for trial all persons who broke the laws, written or unwritten, against the King's peace or against the statutes of the realm . . .").

[5] See 2 Hawkins, ch. 13, §1, at 129 ("[W]herever any [warrantless] arrest may be justified by a private person, in every such case *à fortiori* it may be justified by any [peace] officer").

That the [warrantless] arrest of any other offenders . . . for offences in like manner scandalous and prejudicial to the public, may be justified." 2 Hawkins, ch. 12, § 20, at 122. A number of other common-law commentaries shared Hawkins's broad reading of *Holyday*. See The Law of Arrests 205 (2d ed. 1753) (In light of *Holyday*, "an Arrest of an Offender . . . for any Crime prejudicial to the Publick, seems to be justifiable"); 1 T. Cunningham, A New and Complete Law Dictionary (1771) (definition of "arrest") (same); 1 G. Jacob, The Law Dictionary 129 (1st Am. ed. 1811) (same). See generally C. Greaves, Law of Arrest Without a Warrant, in The Criminal Law Consolidation Acts, p. lxiii (1870) ("*[Holyday]* is rested upon the broad ground that 'it is *pro bono publico* to stay such offenders,' which is equally applicable to every case of misdemeanor . . . ").[6]

We thus find disagreement, not unanimity, among both the common-law jurists and the text writers who sought to pull the cases together and summarize accepted practice. Having reviewed the relevant English decisions, as well as English and colonial American legal treatises, legal dictionaries, and procedure manuals, we simply are not convinced that Atwater's is the correct, or even necessarily the better, reading of the common-law history.

---

[6] *King* v. *Wilkes*, 2 Wils. K. B. 151, 95 Eng. Rep. 737 (1763), and *Money* v. *Leach*, 3 Burr. 1742, 97 Eng. Rep. 1075 (K. B. 1765), two of the decisions arising out of the controversy that generated *Wilkes* v. *Wood*, Lofft 1, 98 Eng. Rep. 489 (C. P. 1763), the "paradigm search and seizure case for Americans" of the founding generation, Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 772 (1994), also contain dicta suggesting a somewhat broader conception of common-law arrest power than the one Atwater advances. See, *e. g.*, *King* v. *Wilkes*, *supra*, at 158, 95 Eng. Rep., at 741 ("[I]f a crime be done in his sight," a justice of the peace "may commit the criminal upon the spot"); *Money* v. *Leach*, *supra*, at 1766, 97 Eng. Rep., at 1088 ("The common law, in many cases, gives authority to arrest without a warrant; more especially, where taken in the very act . . .").

2

A second, and equally serious, problem for Atwater's historical argument is posed by the "divers Statutes," M. Dalton, Country Justice, ch. 170, §4, p. 582 (1727), enacted by Parliament well before this Republic's founding that authorized warrantless misdemeanor arrests without reference to violence or turmoil. Quite apart from Hale and Blackstone, the legal background of any conception of reasonableness the Fourth Amendment's Framers might have entertained would have included English statutes, some centuries old, authorizing peace officers (and even private persons) to make warrantless arrests for all sorts of relatively minor offenses unaccompanied by violence. The so-called "nightwalker" statutes are perhaps the most notable examples. From the enactment of the Statute of Winchester in 1285, through its various readoptions and until its repeal in 1827,[7] night watchmen were authorized and charged "as . . . in Times past" to "watch the Town continually all Night, from the Sun-setting unto the Sun-rising" and were directed that "if any Stranger do pass by them, he shall be arrested until Morning . . . ." 13 Edw. I, ch. 4, §§5–6, 1 Statutes at Large 232–233; see also 5 Edw. III, ch. 14, 1 Statutes at Large 448 (1331) (confirming and extending the powers of watchmen). Hawkins emphasized that the Statute of Winchester "was made" not in derogation but rather "in affirmance of the common law," for "every private person may by the common law arrest any suspicious night-walker, and detain him till he give good account of himself . . . ." 2 Hawkins, ch. 13, §6, at 130. And according to Blackstone, these watchmen had virtually limitless warrantless nighttime arrest power: "Watchmen, either those appointed by the statute of Winchester . . . or such as are mere assistants to the constable, may *virtute officii* arrest all offenders, and particularly nightwalkers, and commit them to custody till the morning." 4 Blackstone 289; see

---

[7] 7 & 8 Geo. IV, ch. 27, 67 Statutes at Large 153.

also 2 Hale, Pleas of the Crown, at 97 (describing broad arrest powers of watchmen even over and above those conferred by the Statute of Winchester).[8] The Statute of Winchester, moreover, empowered peace officers not only to deal with nightwalkers and other nighttime "offenders," but periodically to "make Inquiry of all Persons being lodged in the Suburbs, or in foreign Places of the Towns." On that score, the Statute provided that "if they do find any that have lodged or received any Strangers or suspicious Person, against the Peace, the Bailiffs shall do Righttherein," 13 Edw. I, ch. 4, §§ 3–4, 1 Statutes at Large 232–233, which Hawkins understood "surely" to mean that officers could "lawfully arrest and detain any such stranger[s]," 2 Hawkins, ch. 13, § 12, at 134.

Nor were the nightwalker statutes the only legislative sources of warrantless arrest authority absent real or threatened violence, as the parties and their *amici* here seem to have assumed. On the contrary, following the Edwardian legislation and throughout the period leading up to the framing, Parliament repeatedly extended warrantless arrest power to cover misdemeanor-level offenses not involving any breach of the peace. One 16th-century statute, for instance, authorized peace officers to arrest persons playing "unlawful game[s]" like bowling, tennis, dice, and cards, and for good measure extended the authority beyond players to include persons "haunting" the "houses, places and alleys where such games shall be suspected to be holden, exercised, used

---

[8] Atwater seeks to distinguish the nightwalker statutes by arguing that they "just reflected the reasonable notion that, in an age before lighting, finding a person walking about in the dead of night equaled probable suspicion that the person was a felon." Reply Brief for Petitioners 7, n. 6. Hale indicates, however, that nightwalkers and felons were not considered to be one and the same. 2 Hale, Pleas of the Crown, at 97 ("And such a watchman may apprehend night-walkers and commit them to custody till the morning, and also felons and persons suspected of felony").

or occupied." 33 Hen. VIII, ch. 9, §§11–16, 5 Statutes at Large 84–85 (1541). A 17th-century act empowered "any person . . . whatsoever to seize and detain any . . . hawker, pedlar, petty chapman, or other trading person" found selling without a license. 8 & 9 Wm. III, ch. 25, §§3, 8, 10 Statutes at Large 81–83 (1697). And 18th-century statutes authorized the warrantless arrest of "rogues, vagabonds, beggars, and other idle and disorderly persons" (defined broadly to include jugglers, palm readers, and unlicensed play actors), 17 Geo. II, ch. 5, §§1–2, 5, 18 Statutes at Large 144, 145–147 (1744); "horrid" persons who "profanely swear or curse," 19 Geo. II, ch. 21, §3, 18 Statutes at Large 445 (1746); individuals obstructing "publick streets, lanes or open passages" with "pipes, butts, barrels, casks or other vessels" or an "empty cart, car, dray or other carriage," 30 Geo. II, ch. 22, §§5, 13, 22 Statutes at Large 107–108, 111 (1757); and, most significantly of all given the circumstances of the case before us, negligent carriage drivers, 27 Geo. II, ch. 16, §7, 21 Statutes at Large 188 (1754). See generally S. Blackerby, The Justice of Peace: His Companion, or a Summary of all the Acts of Parliament (1723) (cataloguing statutes); S. Welch, An Essay on the Office of Constable 19–22 (1758) (describing same).

The significance of these early English statutes lies not in proving that any common-law rule barring warrantless misdemeanor arrests that might have existed would have been subject to statutory override; the sovereign Parliament could of course have wiped away any judge-made rule. The point is that the statutes riddle Atwater's supposed common-law rule with enough exceptions to unsettle any contention that the law of the mother country would have left the Fourth Amendment's Framers of a view that it would necessarily have been unreasonable to arrest without warrant for a misdemeanor unaccompanied by real or threatened violence.

## B

An examination of specifically American evidence is to the same effect. Neither the history of the framing era nor subsequent legal development indicates that the Fourth Amendment was originally understood, or has traditionally been read, to embrace Atwater's position.

### 1

To begin with, Atwater has cited no particular evidence that those who framed and ratified the Fourth Amendment sought to limit peace officers' warrantless misdemeanor arrest authority to instances of actual breach of the peace, and our own review of the recent and respected compilations of framing-era documentary history has likewise failed to reveal any such design. See The Complete Bill of Rights 223–263 (N. Cogan ed. 1997) (collecting original sources); 5 The Founders' Constitution 219–244 (P. Kurland & R. Lerner eds. 1987) (same). Nor have we found in any of the modern historical accounts of the Fourth Amendment's adoption any substantial indication that the Framers intended such a restriction. See, *e. g.,* L. Levy, Origins of the Bill of Rights 150–179 (1999); T. Taylor, Two Studies in Constitutional Interpretation 19–93 (1969); J. Landynski, Search and Seizure and the Supreme Court 19–48 (1966); N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 79–105 (1937); Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547 (1999); Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757 (1994); Bradley, Constitutional Theory of the Fourth Amendment, 38 DePaul L. Rev. 817 (1989). Indeed, to the extent these modern histories address the issue, their conclusions are to the contrary. See Landynski, *supra,* at 45 (Fourth Amendment arrest rules are "based on common-law practice," which "dispensed with" a warrant requirement for misdemeanors "committed in the presence of the arresting officer"); Davies, *supra,* at 551 ("[T]he Framers did not address

warrantless intrusions at all in the Fourth Amendment or in the earlier state provisions; thus, they never anticipated that 'unreasonable' might be read as a standard for warrantless intrusions").

The evidence of actual practice also counsels against Atwater's position. During the period leading up to and surrounding the framing of the Bill of Rights, colonial and state legislatures, like Parliament before them, *supra,* at 333–335, regularly authorized local peace officers to make warrantless misdemeanor arrests without conditioning statutory authority on breach of the peace. See, *e. g.,* First Laws of the State of Connecticut 214–215 (Cushing ed. 1982) (1784 compilation; exact date of Act unknown) (authorizing warrantless arrests of "all Persons unnecessarily travelling on the Sabbath or Lord's Day"); *id.,* at 23 ("such as are guilty of Drunkenness, profane Swearing, Sabbath-breaking, also vagrant Persons [and] unseasonable Night-walkers"); Digest of the Laws of the State of Georgia 1755–1800, p. 411 (H. Marbury & W. Crawford eds. 1802) (1762 Act) (breakers of the Sabbath laws); *id.,* at 252 (1764 Act) (persons "gaming . . . in any licensed public house, or other house selling liquors"); Colonial Laws of Massachusetts 139 (1889) (1646 Act) ("such as are overtaken with drink, swearing, Sabbath breaking, Lying, vagrant persons, [and] night-walkers"); Laws of the State of New Hampshire 549 (1800) (1799 Act) (persons "travelling unnecessarily" on Sunday); Digest of the Laws of New Jersey 1709–1838, pp. 585–586 (L. Elmer ed. 1838) (1799 Act) ("vagrants or vagabonds, common drunkards, common night-walkers, and common prostitutes," as well as fortune-tellers and other practitioners of "crafty science"); Laws of the State of New York, 1777–1784, pp. 358–359 (1886) (1781 Act) ("hawker[s]" and "pedlar[s]"); Earliest Printed Laws of New York, 1665–1693, p. 133 (J. Cushing ed. 1978) (Duke of York's Laws, 1665–1675) ("such as are overtaken with Drink, Swearing, Sabbath breaking, Vagrant persons or night walkers"); 3 Laws of the Commonwealth of Pennsylvania 177–183

(1810) (1794 Act) (persons "profanely curs[ing]," drinking excessively, "cock-fighting," or "play[ing] at cards, dice, billiards, bowls, shuffle-boards, or any game of hazard or address, for money").[9]

What we have here, then, is just the opposite of what we had in *Wilson* v. *Arkansas*. There, we emphasized that during the founding era a number of States had "enacted statutes specifically embracing" the common-law knock-and-announce rule, 514 U. S., at 933; here, by contrast, those very same States passed laws extending warrantless arrest authority to a host of nonviolent misdemeanors, and in so doing acted very much inconsistently with Atwater's claims about the Fourth Amendment's object. Of course, the Fourth

---

[9] Given these early colonial and state laws, the fact that a number of States that ratified the Fourth Amendment generally incorporated common-law principles into their own constitutions or statutes, see *Wilson* v. *Arkansas*, 514 U. S. 927, 934 (1995), cannot aid Atwater here. Founding-era receptions of common law, whether by state constitution or state statute, generally provided that common-law rules were subject to statutory alteration. See, *e. g.*, Del. Const., Art. 25 (1776), 2 W. Swindler, Sources and Documents of United States Constitutions 203 (1973) (hereinafter Swindler) ("The common law of England . . . shall remain in force, unless [it] shall be altered by a future law of the legislature"); N. J. Const., Art. XXII (1776), 6 Swindler 452 ("[T]he common law of England . . . shall still remain in force, until [it] shall be altered by a future law of the Legislature"); N. Y. Const., Art. XXXV (1777), 7 Swindler 177–178 ("[S]uch parts of the common law of England, and of the statute law of England and Great Britain . . . as together did form the law of [New York on April 19, 1775,] shall be and continue the law of this State, subject to such alterations and provisions as the legislature of this State shall, from time to time, make concerning the same"); N. C. Laws 1778, ch. V, in 1 First Laws of the State of North Carolina 353 (J. Cushing ed. 1984) ("[A]ll such . . . Parts of the Common Law, as were heretofore in Force and Use within this Territory . . . which have not been . . . abrogated [or] repealed . . . are hereby declared to be in full Force within this State"); Ordinances of May 1776, ch. 5, § 6, 9 Statutes at Large of Virginia 127 (W. Hening ed. 1821) ("[T]he common law of England . . . shall be the rule of decision, and shall be considered in full force, until the same shall be altered by the legislative power of this colony").

Amendment did not originally apply to the States, see *Barron* v. *Mayor of Baltimore*, 7 Pet. 243 (1833), but that does not make state practice irrelevant in unearthing the Amendment's original meaning. A number of state constitutional search-and-seizure provisions served as models for the Fourth Amendment, see, *e. g.*, N. H. Const. of 1784, pt. I, Art. XIX; Pa. Const. of 1776 (Declaration of Rights), Art. X, and the fact that many of the original States with such constitutional limitations continued to grant their own peace officers broad warrantless misdemeanor arrest authority undermines Atwater's contention that the founding generation meant to bar federal law enforcement officers from exercising the same authority. Given the early state practice, it is likewise troublesome for Atwater's view that just one year after the ratification of the Fourth Amendment, Congress vested federal marshals with "the same powers in executing the laws of the United States, as sheriffs and their deputies in the several states have by law, in executing the laws of their respective states." Act of May 2, 1792, ch. 28, §9, 1 Stat. 265. Thus, as we have said before in only slightly different circumstances, the Second Congress apparently "saw no inconsistency between the Fourth Amendment and legislation giving United States marshals the same power as local peace officers" to make warrantless arrests. *United States* v. *Watson*, 423 U. S. 411, 420 (1976).[10]

The record thus supports Justice Powell's observation that "[t]here is no historical evidence that the Framers or proponents of the Fourth Amendment, outspokenly opposed to the infamous general warrants and writs of assistance, were at

---

[10] Courts and commentators alike have read the 1792 Act as conferring broad warrantless arrest authority on federal officers, and, indeed, the Act's passage "so soon after the adoption of the Fourth Amendment itself underscores the probability that the constitutional provision was intended to restrict entirely different practices." *Watson*, 423 U. S., at 429 (Powell, J., concurring); see also Amar, Fourth Amendment First Principles, 107 Harv. L. Rev., at 764, and n. 14.

all concerned about warrantless arrests by local constables and other peace officers." *Id.*, at 429 (concurring opinion). We simply cannot conclude that the Fourth Amendment, as originally understood, forbade peace officers to arrest without a warrant for misdemeanors not amounting to or involving breach of the peace.

### 2

Nor does Atwater's argument from tradition pick up any steam from the historical record as it has unfolded since the framing, there being no indication that her claimed rule has ever become "woven . . . into the fabric" of American law. *Wilson, supra,* at 933; see also *Payton* v. *New York*, 445 U. S., at 590 (emphasizing "the clear consensus among the States adhering to [a] well-settled common-law rule"). The story, on the contrary, is of two centuries of uninterrupted (and largely unchallenged) state and federal practice permitting warrantless arrests for misdemeanors not amounting to or involving breach of the peace.

First, there is no support for Atwater's position in this Court's cases (apart from the isolated sentence in *Carroll*, already explained). Although the Court has not had much to say about warrantless misdemeanor arrest authority, what little we have said tends to cut against Atwater's argument. In discussing this authority, we have focused on the circumstance that an offense was committed in an officer's presence, to the omission of any reference to a breach-of-the-peace limitation.[11] See, *e. g., United States* v. *Watson, supra,* at 418 ("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony

---

[11] We need not, and thus do not, speculate whether the Fourth Amendment entails an "in the presence" requirement for purposes of misdemeanor arrests. Cf. *Welsh* v. *Wisconsin*, 466 U. S. 740, 756 (1984) (White, J., dissenting) ("[T]he requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment").

committed in his presence . . ."); *Carroll,* 267 U. S., at 156–
157 ("The usual rule is that a police officer may arrest with-
out warrant one . . . guilty of a misdemeanor if committed in
his presence"); *Bad Elk* v. *United States,* 177 U. S. 529, 534,
536, n. 1 (1900) (noting common-law pedigree of state statute
permitting warrantless arrest "[f]or a public offense com-
mitted or attempted in [officer's] presence"); *Kurtz* v. *Moffitt,*
115 U. S. 487, 499 (1885) (common-law presence requirement);
cf. also *Welsh* v. *Wisconsin,* 466 U. S. 740, 756 (1984) (White,
J., dissenting) ("'[A]uthority to arrest without a warrant in
misdemeanor cases may be enlarged by statute'").

Second, and again in contrast with *Wilson,* it is not the
case here that "[e]arly American courts . . . embraced" an
accepted common-law rule with anything approaching una-
nimity. *Wilson* v. *Arkansas,* 514 U. S., at 933. To be sure,
Atwater has cited several 19th-century decisions that, at
least at first glance, might seem to support her contention
that "warrantless misdemeanor arrest was unlawful when
not [for] a breach of the peace." Brief for Petitioners 17
(citing *Pow* v. *Beckner,* 3 Ind. 475, 478 (1852), *Commonwealth*
v. *Carey,* 66 Mass. 246, 250 (1853), and *Robison* v. *Miner,*
68 Mich. 549, 556–559, 37 N. W. 21, 25 (1888)). But none is
ultimately availing. *Pow* is fundamentally a "presence"
case; it stands only for the proposition, not at issue here, see
n. 11, *supra,* that a nonfelony arrest should be made while
the offense is "in [the officer's] view and . . . still continuing"
and not subsequently "upon vague information communi-
cated to him." 3 Ind., at 478. The language Atwater at-
tributes to *Carey* ("[E]ven if he were a constable, he had no
power to arrest for any misdemeanor without a warrant, ex-
cept to stay a breach of the peace, or to prevent the commis-
sion of such an offense") is taken from the reporter's sum-
mary of one of the party's arguments, not from the opinion
of the court. While the court in *Carey* (through Chief Jus-
tice Shaw) said that "the old established rule of the common
law" was that "a constable or other peace officer could not

arrest one without a warrant . . . if such crime were not an offence amounting in law to felony," it said just as clearly that the common-law rule could be "altered by the legislature" (notwithstanding Massachusetts's own Fourth Amendment equivalent in its State Constitution). 66 Mass., at 252. *Miner,* the third and final case upon which Atwater relies, was expressly overruled just six years after it was decided. In *Burroughs* v. *Eastman,* 101 Mich. 419, 59 N. W. 817 (1894), the Supreme Court of Michigan held that the language from *Miner* upon which the plaintiff there (and presumably Atwater here) relied "should not be followed," and then went on to offer the following: "[T]he question has arisen in many of our sister states, and the power to authorize arrest on view for offenses not amounting to breaches of the peace has been affirmed. Our attention has been called to no case, nor have we in our research found one, in which the contrary doctrine has been asserted." 101 Mich., at 425, 59 N. W., at 819 (collecting cases from, *e. g.,* Illinois, Indiana, Massachusetts, Minnesota, Missouri, New Hampshire, New York, Ohio, and Texas).

The reports may well contain early American cases more favorable to Atwater's position than the ones she has herself invoked. But more to the point, we think, are the numerous early- and mid-19th-century decisions expressly sustaining (often against constitutional challenge) state and local laws authorizing peace officers to make warrantless arrests for misdemeanors not involving any breach of the peace. See, *e. g., Mayo* v. *Wilson,* 1 N. H. 53 (1817) (upholding statute authorizing warrantless arrests of those unnecessarily traveling on Sunday against challenge based on state due process and search-and-seizure provisions); *Holcomb* v. *Cornish,* 8 Conn. 375 (1831) (upholding statute permitting warrantless arrests for "drunkenness, profane swearing, cursing or sabbath-breaking" against argument that "[t]he power of a justice of the peace to arrest and detain a citizen without complaint or warrant against him, is surely not given by the

common law"); *Jones* v. *Root,* 72 Mass. 435 (1856) (rebuffing constitutional challenge to statute authorizing officers "without a warrant [to] arrest any person or persons whom they may find in the act of illegally selling, transporting, or distributing intoxicating liquors"); *Main* v. *McCarty,* 15 Ill. 441, 442 (1854) (concluding that a law expressly authorizing arrests for city-ordinance violations was "not repugnant to the constitution or the general provisions of law"); *White* v. *Kent,* 11 Ohio St. 550 (1860) (upholding municipal ordinance permitting warrantless arrest of any person found violating any city ordinance or state law); *Davis* v. *American Soc. for Prevention of Cruelty to Animals,* 75 N. Y. 362 (1878) (upholding statute permitting warrantless arrest for misdemeanor violation of cruelty-to-animals prohibition). See generally Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 550, and n. 54 (1924) (collecting cases and observing that "[t]he states may, by statute, enlarge the common law right to arrest without a warrant, and have quite generally done so or authorized municipalities to do so, as for example, an officer may be authorized by statute or ordinance to arrest without a warrant for various misdemeanors and violations of ordinances, other than breaches of the peace, if committed in his presence"); *id.,* at 706, nn. 570, 571 (collecting cases); 1 J. Bishop, New Criminal Procedure §§ 181, 183, pp. 101, n. 2, 103, n. 5 (4th ed. 1895) (same); W. Clark, Handbook of Criminal Procedure § 12, p. 50, n. 8 (2d ed. 1918) (same).

Finally, both the legislative tradition of granting warrantless misdemeanor arrest authority and the judicial tradition of sustaining such statutes against constitutional attack are buttressed by legal commentary that, for more than a century now, has almost uniformly recognized the constitutionality of extending warrantless arrest power to misdemeanors without limitation to breaches of the peace. See, *e. g.,* E. Fisher, Laws of Arrest § 59, p. 130 (1967) ("[I]t is generally recognized today that the common law authority to arrest without a warrant in misdemeanor cases may be enlarged by

statute, and this has been done in many of the states"); Wilgus, *supra*, at 705–706 ("Statutes and municipal charters have quite generally authorized an officer to arrest for any misdemeanor whether a breach of the peace or not, without a warrant, if committed in the officer's presence. Such statutes are valid" (footnote omitted)); Clark, *supra*, § 12, at 50 ("In most, if not all, the states there are statutes and city ordinances, which are clearly valid, authorizing officers to arrest for certain misdemeanors without a warrant, when committed in their presence"); J. Beale, Criminal Pleading and Practice § 21, p. 20, and n. 7 (1899) ("By statute the power of peace officers to arrest without a warrant is often extended to all misdemeanors committed in their presence." "Such a statute is constitutional"); 1 Bishop, *supra*, § 183, at 103 ("[T]he power of arrest extends, possibly, to any indictable wrong in [an officer's] presence. . . . And statutes and ordinances widely permit these arrests for violations of municipal by-laws"); J. Bassett, Criminal Pleading and Practice § 89, p. 104 (2d ed. 1885) ("[A]s to the lesser misdemeanors, except breaches of the peace, the power extends only so far as some statute gives it"). But cf. H. Vorhees, Law of Arrest § 131, pp. 78–79 (1904) (acknowledging that "by authority of statute, city charter, or ordinance, [an officer] may arrest without a warrant, one who . . . commits a misdemeanor other than a breach of the peace," but suggesting that courts look with "disfavor" on such legislative enactments "as interfering with the constitutional liberties of the subject").

Small wonder, then, that today statutes in all 50 States and the District of Columbia permit warrantless misdemeanor arrests by at least some (if not all) peace officers without requiring any breach of the peace,[12] as do a host of congressional enactments.[13] The American Law Institute

---

[12] See Appendix, *infra*.

[13] See, *e. g.*, 18 U. S. C. § 3052 (Federal Bureau of Investigation agents authorized to "make arrests without warrant for any offense against the United States committed in their presence"); § 3053 (same, for United

has long endorsed the validity of such legislation, see American Law Institute, Code of Criminal Procedure § 21(a), p. 28 (1930); American Law Institute, Model Code of Pre-Arraignment Procedure § 120.1(1)(c), p. 13 (1975), and the consensus, as stated in the current literature, is that statutes "remov[ing] the breach of the peace limitation and thereby permit[ting] arrest without warrant for *any* misdemeanor committed in the arresting officer's presence" have "'never been successfully challenged and stan[d] as the law of the land.'" 3 W. LaFave, Search and Seizure § 5.1(b), pp. 13–14, and n. 76 (1996) (quoting *Higbee* v. *San Diego,* 911 F. 2d 377, 379 (CA9 1990)) (emphasis in original; footnote omitted). This, therefore, simply is not a case in which the claimant can point to "a clear answer [that] existed in 1791 and has been generally adhered to by the traditions of our society ever since." *County of Riverside* v. *McLaughlin,* 500 U. S. 44, 60 (1991) (SCALIA, J., dissenting).

## III

While it is true here that history, if not unequivocal, has expressed a decided, majority view that the police need not obtain an arrest warrant merely because a misdemeanor stopped short of violence or a threat of it, Atwater does not wager all on history.[14] Instead, she asks us to mint a new

States marshals and deputies); § 3056(c)(1)(C) (same, for Secret Service agents); § 3061(a)(2) (same, for postal inspectors); § 3063(a)(3) (same, for Environmental Protection Agency officers); 19 U. S. C. § 1589a(3) (same, for customs officers); 21 U. S. C. § 878(a)(3) (same, for Drug Enforcement Administration agents); 25 U. S. C. § 2803(3)(A) (same, for Bureau of Indian Affairs officers).

[14] And, indeed, the dissent chooses not to deal with history at all. See *post,* p. 360 (opinion of O'CONNOR, J.). As is no doubt clear from the text, the historical record is not nearly as murky as the dissent suggests. See, *e. g., supra,* at 333–335 (parliamentary statutes clearly authorizing warrantless arrests for misdemeanor-level offenses), 337–338 (colonial and founding-era state statutes clearly authorizing same). History, moreover, is not just "one of the tools" relevant to a Fourth Amendment inquiry, *post,* at 361. JUSTICE O'CONNOR herself has observed that courts must

rule of constitutional law on the understanding that when historical practice fails to speak conclusively to a claim grounded on the Fourth Amendment, courts are left to strike a current balance between individual and societal interests by subjecting particular contemporary circumstances to traditional standards of reasonableness. See *Wyoming* v. *Houghton,* 526 U. S. 295, 299–300 (1999); *Vernonia School Dist. 47J* v. *Acton,* 515 U. S. 646, 652–653 (1995). Atwater accordingly argues for a modern arrest rule, one not necessarily requiring violent breach of the peace, but nonetheless forbidding custodial arrest, even upon probable cause, when conviction could not ultimately carry any jail time and when the government shows no compelling need for immediate detention.[15]

If we were to derive a rule exclusively to address the uncontested facts of this case, Atwater might well prevail. She was a known and established resident of Lago Vista with no place to hide and no incentive to flee, and common sense says she would almost certainly have buckled up as a condition of driving off with a citation. In her case, the physical incidents of arrest were merely gratuitous humiliations imposed by a police officer who was (at best) exercising

---

be "reluctant . . . to conclude that the Fourth Amendment proscribes a practice that was accepted at the time of adoption of the Bill of Rights and has continued to receive the support of many state legislatures," *Tennessee* v. *Garner,* 471 U. S. 1, 26 (1985) (dissenting opinion), as the practice of making warrantless misdemeanor arrests surely was and has, see *supra,* at 337–345. Because here the dissent "claim[s] that [a] practic[e] accepted when the Fourth Amendment was adopted [is] now constitutionally impermissible," the dissent bears the "heavy burden" of justifying a departure from the historical understanding. 471 U. S., at 26.

[15] Although it is unclear from Atwater's briefs whether the rule she proposes would bar custodial arrests for fine-only offenses even when made pursuant to a warrant, at oral argument Atwater's counsel "concede[d] that if a warrant were obtained, this arrest . . . would . . . be reasonable." Tr. of Oral Arg. 5.

extremely poor judgment. Atwater's claim to live free of pointless indignity and confinement clearly outweighs anything the City can raise against it specific to her case.

But we have traditionally recognized that a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review. See, e. g., *United States* v. *Robinson,* 414 U. S. 218, 234–235 (1973). Often enough, the Fourth Amendment has to be applied on the spur (and in the heat) of the moment, and the object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made. Courts attempting to strike a reasonable Fourth Amendment balance thus credit the government's side with an essential interest in readily administrable rules. See *New York* v. *Belton,* 453 U. S. 454, 458 (1981) (Fourth Amendment rules " 'ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged' " and not " 'qualified by all sorts of ifs, ands, and buts' ").[16]

At first glance, Atwater's argument may seem to respect the values of clarity and simplicity, so far as she claims that the Fourth Amendment generally forbids warrantless arrests for minor crimes not accompanied by violence or some

---

[16] *Terry* v. *Ohio,* 392 U. S. 1 (1968), upon which the dissent relies, see *post,* at 366, is not to the contrary. *Terry* certainly supports a more finely tuned approach to the Fourth Amendment when police act without the traditional justification that either a warrant (in the case of a search) or probable cause (in the case of arrest) provides; but at least in the absence of "extraordinary" circumstances, *Whren* v. *United States,* 517 U. S. 806, 818 (1996), there is no comparable cause for finicking when police act with such justification.

demonstrable threat of it (whether "minor crime" be defined as a fine-only traffic offense, a fine-only offense more generally, or a misdemeanor[17]). But the claim is not ultimately so simple, nor could it be, for complications arise the moment we begin to think about the possible applications of the several criteria Atwater proposes for drawing a line between minor crimes with limited arrest authority and others not so restricted.

One line, she suggests, might be between "jailable" and "fine-only" offenses, between those for which conviction could result in commitment and those for which it could not. The trouble with this distinction, of course, is that an officer on the street might not be able to tell. It is not merely that we cannot expect every police officer to know the details of frequently complex penalty schemes, see *Berkemer* v. *McCarty*, 468 U. S. 420, 431, n. 13 (1984) ("[O]fficers in the field frequently 'have neither the time nor the competence to determine' the severity of the offense for which they are considering arresting a person"), but that penalties for ostensibly identical conduct can vary on account of facts difficult (if not impossible) to know at the scene of an arrest. Is this the first offense or is the suspect a repeat offender?[18] Is the weight of the marijuana a gram above or a gram below

---

[17] Compare, *e. g.*, Brief for Petitioners 46 ("fine-only") with, *e. g.*, Tr. of Oral Arg. 11 (misdemeanors). Because the difficulties attendant to any major crime-minor crime distinction are largely the same, we treat them together.

[18] See, *e. g.*, *Welsh*, 466 U. S., at 756 (first DUI offense subject to maximum fine of $200; subsequent offense punishable by one year's imprisonment); *Carroll* v. *United States*, 267 U. S. 132, 154 (1925) (first offense of smuggling liquor subject to maximum fine of $500; subsequent offense punishable by 90 days' imprisonment); 21 U. S. C. §§ 844a(a), (c) (first offense for possession of "personal use amount" of controlled substance subject to maximum $10,000 fine; subsequent offense punishable by imprisonment); Tex. Penal Code Ann. §§ 42.01, 49.02, 12.23, 12.43 (1994 and Supp. 2001) (first public drunkenness or disorderly conduct offense subject to maximum $500 fine; third offense punishable by 180 days' imprisonment).

the fine-only line?[19]  Where conduct could implicate more than one criminal prohibition, which one will the district attorney ultimately decide to charge?[20]  And so on.

But Atwater's refinements would not end there.  She represents that if the line were drawn at nonjailable traffic offenses, her proposed limitation should be qualified by a proviso authorizing warrantless arrests where "necessary for enforcement of the traffic laws or when [an] offense would otherwise continue and pose a danger to others on the road." Brief for Petitioners 46 (internal quotation marks omitted). (Were the line drawn at misdemeanors generally, a comparable qualification would presumably apply.)  The proviso only compounds the difficulties.  Would, for instance, either exception apply to speeding?  At oral argument, Atwater's counsel said that "it would not be reasonable to arrest a driver for speeding unless the speeding rose to the level of reckless driving."  Tr. of Oral Arg. 16.  But is it not fair to expect that the chronic speeder will speed again despite a citation in his pocket, and should that not qualify as showing that the "offense would . . . continue" under Atwater's rule? And why, as a constitutional matter, should we assume that only reckless driving will "pose a danger to others on the road" while speeding will not?

------------

[19] See, e. g., 21 U. S. C. §§ 844, 844a (possession of "personal use amount" of a controlled substance subject to maximum $10,000 fine; possession of larger amount punishable by one year's imprisonment); Tex. Health & Safety Code Ann. § 481.121(b) (Supp. 2001) (possession of four ounces or less of marijuana a misdemeanor; possession of more than four ounces a felony).  See generally National Survey of State Laws 151–188 (3d R. Leiter ed. 1999) (surveying state laws concerning drug possession).

[20] For instance, the act of allowing a small child to stand unrestrained in the front seat of a moving vehicle at least arguably constitutes child endangerment, which under Texas law is a state jail felony.  Tex. Penal Code Ann. §§ 22.041(c), (f) (Supp. 2001).  Cf. also 21 Am. Jur. 2d, Criminal Law § 28 (1998) ("[S]ome statutory schemes permit courts in their discretion to term certain offenses as felonies or as misdemeanors").

There is no need for more examples to show that Atwater's general rule and limiting proviso promise very little in the way of administrability. It is no answer that the police routinely make judgments on grounds like risk of immediate repetition; they surely do and should. But there is a world of difference between making that judgment in choosing between the discretionary leniency of a summons in place of a clearly lawful arrest, and making the same judgment when the question is the lawfulness of the warrantless arrest itself. It is the difference between no basis for legal action challenging the discretionary judgment, on the one hand, and the prospect of evidentiary exclusion or (as here) personal § 1983 liability for the misapplication of a constitutional standard, on the other. Atwater's rule therefore would not only place police in an almost impossible spot but would guarantee increased litigation over many of the arrests that would occur.[21] For all these reasons, Atwater's various distinctions between permissible and impermissible arrests for minor crimes strike us as "very unsatisfactory line[s]" to require police officers to draw on a moment's notice. *Carroll* v. *United States,* 267 U. S., at 157.

One may ask, of course, why these difficulties may not be answered by a simple tie breaker for the police to follow in the field: if in doubt, do not arrest. The first answer is that in practice the tie breaker would boil down to something akin to a least-restrictive-alternative limitation, which is itself one of those "ifs, ands, and buts" rules, *New York* v. *Belton,* 453 U. S., at 458, generally thought inappropriate in working out Fourth Amendment protection. See, *e. g.,* *Skinner* v. *Railway Labor Executives' Assn.,* 489 U. S. 602,

---

[21] See *United States* v. *Watson,* 423 U. S. 411, 423–424 (1976) ("[T]he judgment of the Nation and Congress has . . . long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like").

629, n. 9 (1989) (collecting cases); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 557–558, n. 12 (1976) ("The logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers").  Beyond that, whatever help the tie breaker might give would come at the price of a systematic disincentive to arrest in situations where even Atwater concedes that arresting would serve an important societal interest.  An officer not quite sure that the drugs weighed enough to warrant jail time or not quite certain about a suspect's risk of flight would not arrest, even though it could perfectly well turn out that, in fact, the offense called for incarceration and the defendant was long gone on the day of trial.  Multiplied many times over, the costs to society of such underenforcement could easily outweigh the costs to defendants of being needlessly arrested and booked, as Atwater herself acknowledges.[22]

Just how easily the costs could outweigh the benefits may be shown by asking, as one Member of this Court did at oral argument, "how bad the problem is out there."  Tr. of Oral Arg. 20.  The very fact that the law has never jelled the way Atwater would have it leads one to wonder whether warrantless misdemeanor arrests need constitutional atten-

---

[22] The doctrine of qualified immunity is not the panacea the dissent believes it to be.  See *post*, at 367–368.  As the dissent itself rightly acknowledges, even where personal liability does not ultimately materialize, the mere "specter of liability" may inhibit public officials in the discharge of their duties, *post*, at 368, for even those officers with airtight qualified immunity defenses are forced to incur "the expenses of litigation" and to endure the "diversion of [their] official energy from pressing public issues," *Harlow* v. *Fitzgerald*, 457 U. S. 800, 814 (1982).  Further, and somewhat perversely, the disincentive to arrest produced by Atwater's opaque standard would be most pronounced in the very situations in which police officers can least afford to hesitate: when acting "on the spur (and in the heat) of the moment," *supra*, at 347.  We could not seriously expect that when events were unfolding fast, an officer would be able to tell with much confidence whether a suspect's conduct qualified, or even "reasonably" qualified, under one of the exceptions to Atwater's general no-arrests rule.

tion, and there is cause to think the answer is no. So far as such arrests might be thought to pose a threat to the probable-cause requirement, anyone arrested for a crime without formal process, whether for felony or misdemeanor, is entitled to a magistrate's review of probable cause within 48 hours, *County of Riverside* v. *McLaughlin,* 500 U. S., at 55–58, and there is no reason to think the procedure in this case atypical in giving the suspect a prompt opportunity to request release, see Tex. Transp. Code Ann. § 543.002 (1999) (persons arrested for traffic offenses to be taken "immediately" before a magistrate). Many jurisdictions, moreover, have chosen to impose more restrictive safeguards through statutes limiting warrantless arrests for minor offenses. See, *e. g.,* Ala. Code § 32–1–4 (1999); Cal. Veh. Code Ann. § 40504 (West 2000); Ky. Rev. Stat. Ann. §§ 431.015(1), (2) (Michie 1999); La. Rev. Stat. Ann. § 32:391 (West 1989); Md. Transp. Code Ann. § 26–202(a)(2) (1999); S. D. Codified Laws § 32–33–2 (1998); Tenn. Code Ann. § 40–7–118(b)(1) (1997); Va. Code Ann. § 46.2–936 (Supp. 2000). It is of course easier to devise a minor-offense limitation by statute than to derive one through the Constitution, simply because the statute can let the arrest power turn on any sort of practical consideration without having to subsume it under a broader principle. It is, in fact, only natural that States should resort to this sort of legislative regulation, for, as Atwater's own *amici* emphasize, it is in the interest of the police to limit petty-offense arrests, which carry costs that are simply too great to incur without good reason. See Brief for Institute on Criminal Justice at the University of Minnesota Law School and Eleven Leading Experts on Law Enforcement and Corrections Administration and Policy as *Amici Curiae* 11 (the use of custodial arrests for minor offenses "[a]ctually [c]ontradicts [l]aw [e]nforcement [i]nterests"). Finally, and significantly, under current doctrine the preference for categorical treatment of Fourth Amendment claims gives way to individualized review when a defendant makes a colorable

argument that an arrest, with or without a warrant, was "conducted in an extraordinary manner, unusually harmful to [his] privacy or even physical interests." *Whren* v. *United States*, 517 U. S., at 818; see also *Graham* v. *Connor*, 490 U. S. 386, 395–396 (1989) (excessive force actionable under § 1983).

The upshot of all these influences, combined with the good sense (and, failing that, the political accountability) of most local lawmakers and law-enforcement officials, is a dearth of horribles demanding redress. Indeed, when Atwater's counsel was asked at oral argument for any indications of comparably foolish, warrantless misdemeanor arrests, he could offer only one.[23] We are sure that there are others,[24] but just as surely the country is not confronting anything like an epidemic of unnecessary minor-offense arrests.[25] That fact caps the reasons for rejecting Atwater's request

---

[23] He referred to a newspaper account of a girl taken into custody for eating french fries in a Washington, D. C., subway station. Tr. of Oral Arg. 20–21; see also Washington Post, Nov. 16, 2000, p. A1 (describing incident). Not surprisingly, given the practical and political considerations discussed in text, the Washington Metro Transit Police recently revised their "zero-tolerance" policy to provide for citation in lieu of custodial arrest of subway snackers. Washington Post, Feb. 27, 2001, at B1.

[24] One of Atwater's *amici* described a handful in its brief. Brief for American Civil Liberties Union et al. as *Amici Curiae* 7–8 (reporting arrests for littering, riding a bicycle without a bell or gong, operating a business without a license, and "walking as to create a hazard").

[25] The dissent insists that a minor traffic infraction "may often serve as an excuse" for harassment, and that fine-only misdemeanor prohibitions "may be enforced" in an arbitrary manner. *Post*, at 372. Thus, the dissent warns, the rule that we recognize today "has potentially serious consequences for the everyday lives of Americans" and "carries with it grave potential for abuse." *Post*, at 371, 372. But the dissent's own language (*e. g.*, "may," "potentially") betrays the speculative nature of its claims. Noticeably absent from the parade of horribles is any indication that the "potential for abuse" has ever ripened into a reality. In fact, as we have pointed out in text, there simply is no evidence of widespread abuse of minor-offense arrest authority.

for the development of a new and distinct body of constitutional law.

Accordingly, we confirm today what our prior cases have intimated: the standard of probable cause "applie[s] to all arrests, without the need to 'balance' the interests and circumstances involved in particular situations." *Dunaway* v. *New York*, 442 U. S. 200, 208 (1979). If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.

## IV

Atwater's arrest satisfied constitutional requirements. There is no dispute that Officer Turek had probable cause to believe that Atwater had committed a crime in his presence. She admits that neither she nor her children were wearing seatbelts, as required by Tex. Transp. Code Ann. § 545.413 (1999). Turek was accordingly authorized (not required, but authorized) to make a custodial arrest without balancing costs and benefits or determining whether or not Atwater's arrest was in some sense necessary.

Nor was the arrest made in an "extraordinary manner, unusually harmful to [her] privacy or . . . physical interests." *Whren* v. *United States*, 517 U. S., at 818. As our citations in *Whren* make clear, the question whether a search or seizure is "extraordinary" turns, above all else, on the manner in which the search or seizure is executed. See *ibid.* (citing *Tennessee* v. *Garner*, 471 U. S. 1 (1985) ("seizure by means of deadly force"), *Wilson* v. *Arkansas*, 514 U. S. 927 (1995) ("unannounced entry into a home"), *Welsh* v. *Wisconsin*, 466 U. S. 740 (1984) ("entry into a home without a warrant"), and *Winston* v. *Lee*, 470 U. S. 753 (1985) ("physical penetration of the body")). Atwater's arrest was surely "humiliating," as she says in her brief, but it was no more "harmful to . . . privacy or . . . physical interests" than the normal custodial arrest. She was handcuffed, placed in a squad car, and

taken to the local police station, where officers asked her to remove her shoes, jewelry, and glasses, and to empty her pockets. They then took her photograph and placed her in a cell, alone, for about an hour, after which she was taken before a magistrate, and released on $310 bond. The arrest and booking were inconvenient and embarrassing to Atwater, but not so extraordinary as to violate the Fourth Amendment.

The Court of Appeals's en banc judgment is affirmed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

State Statutes Authorizing Warrantless Misdemeanor Arrests

Ala. Code § 15–10–3(a)(1) (Supp. 2000) (authorizing warrantless arrest for any "public offense" committed in the presence of the officer);

Alaska Stat. Ann. § 12.25.030(a)(1) (2000) ("for a crime committed . . . in the presence of the person making the arrest");

Ariz. Rev. Stat. Ann. § 13–3883(a)(2) (Supp. 2000) (for a misdemeanor committed in the officer's presence);

Ark. Code Ann. § 16–81–106(b)(2)(a) (Supp. 1999) ("where a public offense is committed in [the officer's] presence");

Cal. Penal Code Ann. § 836(a)(1) (West Supp. 2001) (where "the person to be arrested has committed a public offense in the officer's presence");

Colo. Rev. Stat. § 16–3–102(1)(b) (2000) (when "[a]ny crime has been or is being committed" in the officer's presence);

Conn. Gen. Stat. § 54–1f(a) (Supp. 2000) (for "any offense" when arrestee is taken in the act);

Del. Code Ann., Tit. 11, § 1904(a)(1) (1995) (for any misdemeanor committed in the officer's presence);

D. C. Code Ann. § 23–581(a)(1)(B) (1996) (where officer has probable cause to believe a person has committed an offense in the officer's presence);

Fla. Stat. § 901.15(1) (Supp. 2001) (for misdemeanor or ordinance violation committed in presence of the officer);

Ga. Code Ann. § 17–4–20(a) (Supp. 1996) ("for a crime . . . if the offense is committed in [the] officer's presence");

Haw. Rev. Stat. § 803–5(a) (1999) ("when the officer has probable cause to believe that [a] person has committed any offense");

Idaho Code § 19–603(1) (1997) ("[f]or a public offense committed or attempted in [officer's] presence");

Ill. Comp. Stat., ch. 725, § 5/107–2(1)(c) (1992) (when the officer "has reasonable grounds to believe that the person is committing or has committed an offense");

Ind. Code § 35–33–1–1(a)(4) (Supp. 2000) (when the officer has probable cause to believe a person "is committing or attempting to commit a misdemeanor in the officer's presence");

Iowa Code § 804.7(1) (1994) ("[f]or a public offense committed or attempted in the peace officer's presence");

Kan. Stat. Ann. § 22–2401(d) (1999 Cum. Supp.) (for "[a]ny crime, except a traffic infraction or a cigarette or tobacco infraction," committed in the officer's view);

Ky. Rev. Stat. Ann. § 431.005(1)(d) (Michie 1999) (for any offense punishable by confinement committed in the officer's presence); § 431.015(2) (Supp. 2000) (officer should generally issue citation rather than arrest for certain minor "violations");

La. Code Crim. Proc. Ann., Art. 213(3) (West 1991) (where the officer "has reasonable cause to believe that the person to be arrested has committed an offense");

Me. Rev. Stat. Ann., Tit. 15, § 704 (1980) ("persons found violating any law of the State or any legal ordinance or bylaw

of a town"); Tit. 17–A, § 15(1)(B) (1983 and Supp. 2000) (for misdemeanors committed in the officer's presence);

Md. Ann. Code, Art. 27, § 594B(a) (1996 and 2000 Supp.) (any person who commits, or attempts to commit, "any felony or misdemeanor" in the presence of an officer);

Mass. Gen. Laws, ch. 276, § 28 (1997) (for designated misdemeanor offenses); ch. 272, § 60 (for littering offenses where identity of arrestee is not known to officer);

Mich. Comp. Laws Ann. § 764.15(1)(a) (West 2000) (for felony, misdemeanor, or ordinance violation committed in the officer's presence);

Minn. Stat. § 629.34(1)(c)(1) (Supp. 2001) ("when a public offense has been committed or attempted in the officer's presence");

Miss. Code Ann. § 99–3–7 (Supp. 1998) (for indictable offense committed in presence of officer); § 45–3–21(1)(a)(vi) (by Highway Safety Patrol Officers of "any person or persons committing or attempting to commit any misdemeanor, felony or breach of the peace within their presence or view");

Mo. Rev. Stat. § 479.110 (2000) (of "any person who commits an offense in [the officer's] presence");

Mont. Code Ann. § 46–6–311(1) (1997) (if "the officer has probable cause to believe that the person is committing an offense");

Neb. Rev. Stat. § 29–404.02(2)(d) (1995) (when the officer has probable cause to believe that the person has committed a misdemeanor in his presence);

Nev. Rev. Stat. § 171.172 (1997) (in fresh pursuit of a person who commits "any criminal offense" in the presence of the officer);

N. H. Rev. Stat. Ann. § 614:7 (Supp. 2000) (in fresh pursuit of any person who has committed "any criminal offense" in the presence of the officer); § 594:10(I)(a) (upon probable

cause for misdemeanor or violation committed in officer's presence);

N. J. Stat. Ann. § 53:2–1 (West Supp. 2000) ("for violations of the law committed in [the officers'] presence");

N. M. Stat. Ann. § 3–13–2(A)(4)(d) (1999) ("any person in the act of violating the laws of the state or the ordinances of the municipality"); § 30–16–16(B) (1994) (for falsely obtaining services or accommodations); § 30–16–23 (of any person officer has probable cause to believe has committed the crime of shoplifting);

N. Y. Crim. Proc. Law §§ 140.10(1)(a) and (2) (McKinney Supp. 2001) (when officer has probable cause to believe any offense has been committed in his presence and probable cause to believe person to be arrested committed the offense);

N. C. Gen. Stat. § 15A–401(b) (1999) (where an officer has probable cause to believe the person has committed "a criminal offense" in the officer's presence and for misdemeanors out of the officers presence in certain circumstances);

N. D. Cent. Code § 29–06–15(1)(a) (Supp. 1999) ("[f]or a public offense, committed or attempted in the officer's presence");

Ohio Rev. Code Ann. § 2935.03 (1997 and Supp. 2000) (of a person "found violating . . . a law of this state, an ordinance of a municipal corporation, or a resolution of a township"); but see § 2935.26 (1997) (providing that notwithstanding any other provision of the Revised Code, when a law enforcement officer is otherwise authorized to arrest a person for the commission of a minor misdemeanor, the officer shall not arrest the person, but shall issue a citation, except in specified circumstances);

Okla. Stat., Tit. 22, § 196(1) (Supp. 2001) ("[f]or a public offense, committed or attempted in [the officer's] presence");

Ore. Rev. Stat. § 133.310(1) (1997) (upon probable cause for any felony, Class A misdemeanor, or any other offense in the

officer's presence except "traffic infractions" and minor "violations");

Pa. Stat. Ann., Tit. 71, § 252(a) (Purdon 1990) ("for all violations of the law, including laws regulating the use of the highways, which they may witness");

R. I. Gen. Laws § 12–7–3 (2000) (for misdemeanors and petty misdemeanors where "[t]he officer has reasonable grounds to believe that [the] person cannot be arrested later, or [m]ay cause injury to himself or herself or others or loss or damage to property unless immediately arrested");

S. C. Code Ann. § 17–13–30 (1985) (of persons who, in the presence of the officer, "violate any of the criminal laws of this State if such arrest be made at the time of such violation of law or immediately thereafter");

S. D. Codified Laws § 23A–3–2 (1998) ("[f]or a public offense, other than a petty offense, committed or attempted in [the officer's] presence");

Tenn. Code Ann. § 40–7–103(a)(1) (Supp. 2000) ("[f]or a public offense committed or a breach of the peace threatened in the officer's presence"); see also § 40–7–118(b)(1) (1997) (officer who has arrested a person for the commission of a misdemeanor should generally issue a citation to such arrested person to appear in court in lieu of the continued custody and the taking of the arrested person before a magistrate);

Tex. Code Crim. Proc. Ann., Art. 14.01 (Vernon 1977) ("for any offense committed in his presence or within his view");

Utah Code Ann. § 10–3–915 (1999) (for "any offense directly prohibited by the laws of this state or by ordinance"); § 77–7–2 (for any public offense committed in presence of officer);

Vt. Rule Crim. Proc. 3(a) (2000) (where officer has probable cause to believe that "a crime" is committed in his presence); see also Rule 3(c) (law enforcement officer acting without warrant who is authorized to arrest a person for a misdemeanor should generally issue a citation to appear before a judicial officer in lieu of arrest);

Va. Code Ann. § 19.2–81 (2000) (of "any person who commits any crime in the presence of [an] officer");

Wash. Rev. Code § 10.31.100 (Supp. 2001), as amended by 2000 Wash. Laws 119, § 4 (for misdemeanors committed in the presence of the officer);

W. Va. Code § 62–10–9 (2000) ("for all violations of any of the criminal laws of the United States, or of this state, when committed in [an officer's] presence");

Wis. Stat. § 968.07(1)(d) (1998) (when "[t]here are reasonable grounds to believe that the person is committing or has committed a crime"); and

Wyo. Stat. Ann. § 7–2–102(b)(i) (1999) (when "[a]ny criminal offense" is committed "in the officer's presence").

JUSTICE O'CONNOR, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures." The Court recognizes that the arrest of Gail Atwater was a "pointless indignity" that served no discernible state interest, *ante,* at 347, and yet holds that her arrest was constitutionally permissible. Because the Court's position is inconsistent with the explicit guarantee of the Fourth Amendment, I dissent.

I

A full custodial arrest, such as the one to which Ms. Atwater was subjected, is the quintessential seizure. See *Payton* v. *New York,* 445 U. S. 573, 585 (1980). When a full custodial arrest is effected without a warrant, the plain language of the Fourth Amendment requires that the arrest be reasonable. See *ibid.* It is beyond cavil that "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania* v. *Mimms,* 434 U. S. 106, 108–109 (1977) *(per curiam)* (quoting *Terry* v. *Ohio,* 392 U. S. 1, 19

(1968)). See also, *e. g.*, *United States* v. *Ramirez*, 523 U. S. 65, 71 (1998); *Maryland* v. *Wilson*, 519 U. S. 408, 411 (1997); *Ohio* v. *Robinette*, 519 U. S. 33, 39 (1996); *Florida* v. *Jimeno*, 500 U. S. 248, 250 (1991); *United States* v. *Chadwick*, 433 U. S. 1, 9 (1977).

We have "often looked to the common law in evaluating the reasonableness, for Fourth Amendment purposes, of police activity." *Tennessee* v. *Garner*, 471 U. S. 1, 13 (1985). But history is just one of the tools we use in conducting the reasonableness inquiry. See *id.*, at 13–19; see also *Wilson* v. *Arkansas*, 514 U. S. 927, 929 (1995); *Wyoming* v. *Houghton*, 526 U. S. 295, 307 (1999) (BREYER, J., concurring). And when history is inconclusive, as the majority amply demonstrates it is in this case, see *ante*, at 326–345, we will "evaluate the search or seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming* v. *Houghton, supra*, at 300. See also, *e. g.*, *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 619 (1989); *Tennessee* v. *Garner, supra*, at 8; *Delaware* v. *Prouse*, 440 U. S. 648, 654 (1979); *Pennsylvania* v. *Mimms, supra*, at 109. In other words, in determining reasonableness, "[e]ach case is to be decided on its own facts and circumstances." *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 357 (1931).

The majority gives a brief nod to this bedrock principle of our Fourth Amendment jurisprudence, and even acknowledges that "Atwater's claim to live free of pointless indignity and confinement clearly outweighs anything the City can raise against it specific to her case." *Ante*, at 347. But instead of remedying this imbalance, the majority allows itself to be swayed by the worry that "every discretionary judgment in the field [will] be converted into an occasion for constitutional review." *Ibid.* It therefore mints a new rule that "[i]f an officer has probable cause to believe that an indi-

vidual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Ante*, at 354. This rule is not only unsupported by our precedent, but runs contrary to the principles that lie at the core of the Fourth Amendment.

As the majority tacitly acknowledges, we have never considered the precise question presented here, namely, the constitutionality of a warrantless arrest for an offense punishable only by fine. Cf. *ibid.* Indeed, on the rare occasions that Members of this Court have contemplated such an arrest, they have indicated disapproval. See, *e. g., Gustafson* v. *Florida,* 414 U. S. 260, 266–267 (1973) (Stewart, J., concurring) ("[A] persuasive claim might have been made . . . that the custodial arrest of the petitioner for a minor traffic offense violated his rights under the Fourth and Fourteenth Amendments. But no such claim has been made"); *United States* v. *Robinson,* 414 U. S. 218, 238, n. 2 (1973) (Powell, J., concurring) (the validity of a custodial arrest for a minor traffic offense is not "self-evident").

To be sure, we have held that the existence of probable cause is a necessary condition for an arrest. See *Dunaway* v. *New York,* 442 U. S. 200, 213–214 (1979). And in the case of felonies punishable by a term of imprisonment, we have held that the existence of probable cause is also a sufficient condition for an arrest. See *United States* v. *Watson,* 423 U. S. 411, 416–417 (1976). In *Watson,* however, there was a clear and consistently applied common law rule permitting warrantless felony arrests. See *id.,* at 417–422. Accordingly, our inquiry ended there and we had no need to assess the reasonableness of such arrests by weighing individual liberty interests against state interests. Cf. *Wyoming* v. *Houghton, supra,* at 299–300; *Tennessee* v. *Garner, supra,* at 26 (O'CONNOR, J., dissenting) (criticizing majority for disregarding undisputed common law rule).

Here, however, we have no such luxury. The Court's thorough exegesis makes it abundantly clear that warrantless

misdemeanor arrests were not the subject of a clear and consistently applied rule at common law. See, *e. g., ante,* at 332 (finding "disagreement, not unanimity, among both the common-law jurists and the text writers"); *ante,* at 335 (acknowledging that certain early English statutes serve only to "riddle Atwater's supposed common-law rule with enough exceptions to unsettle any contention [that there was a clear common-law rule barring warrantless arrests for misdemeanors that were not breaches of the peace]"). We therefore must engage in the balancing test required by the Fourth Amendment. See *Wyoming* v. *Houghton, supra,* at 299–300. While probable cause is surely a necessary condition for warrantless arrests for fine-only offenses, see *Dunaway* v. *New York, supra,* at 213–214, any realistic assessment of the interests implicated by such arrests demonstrates that probable cause alone is not a sufficient condition. See *infra,* at 364–366.

Our decision in *Whren* v. *United States,* 517 U. S. 806 (1996), is not to the contrary. The specific question presented there was whether, in evaluating the Fourth Amendment reasonableness of a traffic stop, the subjective intent of the police officer is a relevant consideration. *Id.,* at 808, 814. We held that it is not, and stated that "[t]he making of a traffic stop . . . is governed by the usual rule that probable cause to believe the law has been broken 'outbalances' private interest in avoiding police contact." *Id.,* at 818.

We of course did not have occasion in *Whren* to consider the constitutional preconditions for warrantless arrests for fine-only offenses. Nor should our words be taken beyond their context. There are significant qualitative differences between a traffic stop and a full custodial arrest. While both are seizures that fall within the ambit of the Fourth Amendment, the latter entails a much greater intrusion on an individual's liberty and privacy interests. As we have said, "[a] motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend

a short period of time answering questions and waiting while the officer checks his license and registration, that he may be given a citation, but that in the end he most likely will be allowed to continue on his way." *Berkemer* v. *McCarty*, 468 U. S. 420, 437 (1984). Thus, when there is probable cause to believe that a person has violated a minor traffic law, there can be little question that the state interest in law enforcement will justify the relatively limited intrusion of a traffic stop. It is by no means certain, however, that where the offense is punishable only by fine, "probable cause to believe the law has been broken [will] 'outbalanc[e]' private interest in avoiding" a full custodial arrest. *Whren* v. *United States, supra*, at 818. Justifying a full arrest by the same quantum of evidence that justifies a traffic stop—even though the offender cannot ultimately be imprisoned for her conduct—defies any sense of proportionality and is in serious tension with the Fourth Amendment's proscription of unreasonable seizures.

A custodial arrest exacts an obvious toll on an individual's liberty and privacy, even when the period of custody is relatively brief. The arrestee is subject to a full search of her person and confiscation of her possessions. *United States* v. *Robinson, supra*. If the arrestee is the occupant of a car, the entire passenger compartment of the car, including packages therein, is subject to search as well. See *New York* v. *Belton*, 453 U. S. 454 (1981). The arrestee may be detained for up to 48 hours without having a magistrate determine whether there in fact was probable cause for the arrest. See *County of Riverside* v. *McLaughlin*, 500 U. S. 44 (1991). Because people arrested for all types of violent and nonviolent offenses may be housed together awaiting such review, this detention period is potentially dangerous. Rosazza & Cook, Jail Intake: Managing A Critical Function—Part One: Resources, 13 American Jails 35 (Mar./Apr. 1999). And once the period of custody is over, the fact of the arrest is a per-

manent part of the public record. Cf. *Paul* v. *Davis*, 424 U. S. 693 (1976).

We have said that "the penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense." *Welsh* v. *Wisconsin*, 466 U. S. 740, 754, n. 14 (1984). If the State has decided that a fine, and not imprisonment, is the appropriate punishment for an offense, the State's interest in taking a person suspected of committing that offense into custody is surely limited, at best. This is not to say that the State will never have such an interest. A full custodial arrest may on occasion vindicate legitimate state interests, even if the crime is punishable only by fine. Arrest is the surest way to abate criminal conduct. It may also allow the police to verify the offender's identity and, if the offender poses a flight risk, to ensure her appearance at trial. But when such considerations are not present, a citation or summons may serve the State's remaining law enforcement interests every bit as effectively as an arrest. Cf. Lodging for State of Texas et al. as *Amici Curiae* (Texas Department of Public Safety, Student Handout, Traffic Law Enforcement 1 (1999)) ("Citations. . . . Definition—a means of getting violators to court without physical arrest. A citation should be used when it will serve this purpose except when by issuing a citation and releasing the violator, the safety of the public and/or the violator might be imperiled as in the case of D. W. I.").

Because a full custodial arrest is such a severe intrusion on an individual's liberty, its reasonableness hinges on "the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming* v. *Houghton*, 526 U. S., at 300. In light of the availability of citations to promote a State's interests when a fine-only offense has been committed, I cannot concur in a rule which deems a full custodial arrest to be reasonable in every circumstance. Giving police

officers constitutional carte blanche to effect an arrest when-
ever there is probable cause to believe a fine-only misde-
meanor has been committed is irreconcilable with the Fourth
Amendment's command that seizures be reasonable. In-
stead, I would require that when there is probable cause to
believe that a fine-only offense has been committed, the po-
lice officer should issue a citation unless the officer is "able
to point to specific and articulable facts which, taken to-
gether with rational inferences from those facts, reasonably
warrant [the additional] intrusion" of a full custodial arrest.
*Terry* v. *Ohio,* 392 U. S., at 21.

The majority insists that a bright-line rule focused on
probable cause is necessary to vindicate the State's interest
in easily administrable law enforcement rules. See *ante,* at
347–351. Probable cause itself, however, is not a model of
precision. "The quantum of information which constitutes
probable cause—evidence which would 'warrant a man of
reasonable caution in the belief' that a [crime] has been com-
mitted—must be measured by the facts of the particular
case." *Wong Sun* v. *United States,* 371 U. S. 471, 479 (1963)
(citation omitted). The rule I propose—which merely re-
quires a legitimate reason for the decision to escalate the
seizure into a full custodial arrest—thus does not undermine
an otherwise "clear and simple" rule. Cf. *ante,* at 347.

While clarity is certainly a value worthy of consideration
in our Fourth Amendment jurisprudence, it by no means
trumps the values of liberty and privacy at the heart of the
Amendment's protections. What the *Terry* rule lacks in
precision it makes up for in fidelity to the Fourth Amend-
ment's command of reasonableness and sensitivity to the
competing values protected by that Amendment. Over the
past 30 years, it appears that the *Terry* rule has been work-
able and easily applied by officers on the street.

At bottom, the majority offers two related reasons why a
bright-line rule is necessary: the fear that officers who arrest
for fine-only offenses will be subject to "personal [42 U. S. C.]

§ 1983 liability for the misapplication of a constitutional standard," *ante*, at 350, and the resulting "systematic disincentive to arrest . . . where . . . arresting would serve an important societal interest," *ante*, at 351. These concerns are certainly valid, but they are more than adequately resolved by the doctrine of qualified immunity.

Qualified immunity was created to shield government officials from civil liability for the performance of discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). This doctrine is "the best attainable accommodation of competing values," namely, the obligation to enforce constitutional guarantees and the need to protect officials who are required to exercise their discretion. *Id.*, at 814.

In *Anderson* v. *Creighton*, 483 U. S. 635 (1987), we made clear that the standard of reasonableness for a search or seizure under the Fourth Amendment is distinct from the standard of reasonableness for qualified immunity purposes. *Id.*, at 641. If a law enforcement officer "reasonably but mistakenly conclude[s]" that the constitutional predicate for a search or seizure is present, he "should not be held personally liable." *Ibid.*

This doctrine thus allays any concerns about liability or disincentives to arrest. If, for example, an officer reasonably thinks that a suspect poses a flight risk or might be a danger to the community if released, cf. *ante*, at 351, he may arrest without fear of the legal consequences. Similarly, if an officer reasonably concludes that a suspect may possess more than four ounces of marijuana and thus might be guilty of a felony, cf. *ante*, at 348–349, and n. 19, 351, the officer will be insulated from liability for arresting the suspect even if the initial assessment turns out to be factually incorrect. As we have said, "officials will not be liable for mere mistakes in judgment." *Butz* v. *Economou*, 438 U. S. 478, 507

(1978). Of course, even the specter of liability can entail substantial social costs, such as inhibiting public officials in the discharge of their duties. See, *e. g., Harlow* v. *Fitzgerald, supra,* at 814. We may not ignore the central command of the Fourth Amendment, however, to avoid these costs.

## II

The record in this case makes it abundantly clear that Ms. Atwater's arrest was constitutionally unreasonable. Atwater readily admits—as she did when Officer Turek pulled her over—that she violated Texas' seatbelt law. Brief for Petitioners 2–3; Record 381, 384. While Turek was justified in stopping Atwater, see *Whren* v. *United States,* 517 U. S., at 819, neither law nor reason supports his decision to arrest her instead of simply giving her a citation. The officer's actions cannot sensibly be viewed as a permissible means of balancing Atwater's Fourth Amendment interests with the State's own legitimate interests.

There is no question that Officer Turek's actions severely infringed Atwater's liberty and privacy. Turek was loud and accusatory from the moment he approached Atwater's car. Atwater's young children were terrified and hysterical. Yet when Atwater asked Turek to lower his voice because he was scaring the children, he responded by jabbing his finger in Atwater's face and saying, "You're going to jail." Record 382, 384. Having made the decision to arrest, Turek did not inform Atwater of her right to remain silent. *Id.,* at 390, 704. He instead asked for her license and insurance information. *Id.,* at 382. But cf. *Miranda* v. *Arizona,* 384 U. S. 436 (1966).

Atwater asked if she could at least take her children to a friend's house down the street before going to the police station. Record 384. But Turek—who had just castigated Atwater for not caring for her children—refused and said he would take the children into custody as well. *Id.,* at 384, 427, 704–705. Only the intervention of neighborhood

children who had witnessed the scene and summoned one of Atwater's friends saved the children from being hauled to jail with their mother. *Id.*, at 382, 385–386.

With the children gone, Officer Turek handcuffed Ms. Atwater with her hands behind her back, placed her in the police car, and drove her to the police station. *Id.*, at 386–387. Ironically, Turek did not secure Atwater in a seatbelt for the drive. *Id.*, at 386. At the station, Atwater was forced to remove her shoes, relinquish her possessions, and wait in a holding cell for about an hour. *Id.*, at 387, 706. A judge finally informed Atwater of her rights and the charges against her, and released her when she posted bond. *Id.*, at 387–388, 706. Atwater returned to the scene of the arrest, only to find that her car had been towed. *Id.*, at 389.

Ms. Atwater ultimately pleaded no contest to violating the seatbelt law and was fined $50. *Id.*, at 403. Even though that fine was the maximum penalty for her crime, Tex. Transp. Code Ann. § 545.413(d) (1999), and even though Officer Turek has never articulated any justification for his actions, the city contends that arresting Atwater was constitutionally reasonable because it advanced two legitimate interests: "the enforcement of child safety laws and encouraging [Atwater] to appear for trial." Brief for Respondents 15.

It is difficult to see how arresting Atwater served either of these goals any more effectively than the issuance of a citation. With respect to the goal of law enforcement generally, Atwater did not pose a great danger to the community. She had been driving very slowly—approximately 15 miles per hour—in broad daylight on a residential street that had no other traffic. Record 380. Nor was she a repeat offender; until that day, she had received one traffic citation in her life—a ticket, more than 10 years earlier, for failure to signal a lane change. *Id.*, at 378. Although Officer Turek had stopped Atwater approximately three months earlier because he thought that Atwater's son was not wearing a seatbelt, *id.*, at 420, Turek had been mistaken, *id.*, at 379, 703.

Moreover, Atwater immediately accepted responsibility and apologized for her conduct. *Id.*, at 381, 384, 420. Thus, there was every indication that Atwater would have buckled herself and her children in had she been cited and allowed to leave.

With respect to the related goal of child welfare, the decision to arrest Atwater was nothing short of counterproductive. Atwater's children witnessed Officer Turek yell at their mother and threaten to take them all into custody. Ultimately, they were forced to leave her behind with Turek, knowing that she was being taken to jail. Understandably, the 3-year-old boy was "very, very, very traumatized." *Id.*, at 393. After the incident, he had to see a child psychologist regularly, who reported that the boy "felt very guilty that he couldn't stop this horrible thing . . . he was powerless to help his mother or sister." *Id.*, at 396. Both of Atwater's children are now terrified at the sight of any police car. *Id.*, at 393, 395. According to Atwater, the arrest "just never leaves us. It's a conversation we have every other day, once a week, and it's—it raises its head constantly in our lives." *Id.*, at 395.

Citing Atwater surely would have served the children's interests well. It would have taught Atwater to ensure that her children were buckled up in the future. It also would have taught the children an important lesson in accepting responsibility and obeying the law. Arresting Atwater, though, taught the children an entirely different lesson: that "the bad person could just as easily be the policeman as it could be the most horrible person they could imagine." *Ibid.*

Respondents also contend that the arrest was necessary to ensure Atwater's appearance in court. Atwater, however, was far from a flight risk. A 16-year resident of Lago Vista, population 2,486, Atwater was not likely to abscond. See Record 376; Texas State Data Center, 1997 Total Population Estimates for Texas Places 15 (Sept. 1998). Although she

was unable to produce her driver's license because it had been stolen, she gave Officer Turek her license number and address. Record 386. In addition, Officer Turek knew from their previous encounter that Atwater was a local resident.

The city's justifications fall far short of rationalizing the extraordinary intrusion on Gail Atwater and her children. Measuring "the degree to which [Atwater's custodial arrest was] needed for the promotion of legitimate governmental interests," against "the degree to which it intrud[ed] upon [her] privacy," *Wyoming* v. *Houghton*, 526 U. S., at 300, it can hardly be doubted that Turek's actions were disproportionate to Atwater's crime. The majority's assessment that "Atwater's claim to live free of pointless indignity and confinement clearly outweighs anything the City can raise against it specific to her case," *ante*, at 347, is quite correct. In my view, the Fourth Amendment inquiry ends there.

### III

The Court's error, however, does not merely affect the disposition of this case. The *per se* rule that the Court creates has potentially serious consequences for the everyday lives of Americans. A broad range of conduct falls into the category of fine-only misdemeanors. In Texas alone, for example, disobeying any sort of traffic warning sign is a misdemeanor punishable only by fine, see Tex. Transp. Code Ann. § 472.022 (1999 and Supp. 2000–2001), as is failing to pay a highway toll, see § 284.070, and driving with expired license plates, see § 502.407. Nor are fine-only crimes limited to the traffic context. In several States, for example, littering is a criminal offense punishable only by fine. See, *e. g.*, Cal. Penal Code Ann. § 374.7 (West 1999); Ga. Code Ann. § 16–7–43 (1996); Iowa Code §§ 321.369, 805.8(2)(af) (Supp. 2001).

To be sure, such laws are valid and wise exercises of the States' power to protect the public health and welfare. My concern lies not with the decision to enact or enforce these

laws, but rather with the manner in which they may be enforced. Under today's holding, when a police officer has probable cause to believe that a fine-only misdemeanor offense has occurred, that officer may stop the suspect, issue a citation, and let the person continue on her way. Cf. *Whren v. United States,* 517 U. S., at 806. Or, if a traffic violation, the officer may stop the car, arrest the driver, see *ante,* at 354, search the driver, see *United States* v. *Robinson,* 414 U. S., at 235, search the entire passenger compartment of the car including any purse or package inside, see *New York* v. *Belton,* 453 U. S., at 460, and impound the car and inventory all of its contents, see *Colorado* v. *Bertine,* 479 U. S. 367, 374 (1987); *Florida* v. *Wells,* 495 U. S. 1, 4–5 (1990). Although the Fourth Amendment expressly requires that the latter course be a reasonable and proportional response to the circumstances of the offense, the majority gives officers unfettered discretion to choose that course without articulating a single reason why such action is appropriate.

Such unbounded discretion carries with it grave potential for abuse. The majority takes comfort in the lack of evidence of "an epidemic of unnecessary minor-offense arrests." *Ante,* at 353, and n. 25. But the relatively small number of published cases dealing with such arrests proves little and should provide little solace. Indeed, as the recent debate over racial profiling demonstrates all too clearly, a relatively minor traffic infraction may often serve as an excuse for stopping and harassing an individual. After today, the arsenal available to any officer extends to a full arrest and the searches permissible concomitant to that arrest. An officer's subjective motivations for making a traffic stop are not relevant considerations in determining the reasonableness of the stop. See *Whren* v. *United States, supra,* at 813. But it is precisely because these motivations are beyond our purview that we must vigilantly ensure that officers' poststop actions—which are properly within our reach—comport with the Fourth Amendment's guarantee of reasonableness.

\*    \*    \*

The Court neglects the Fourth Amendment's express command in the name of administrative ease. In so doing, it cloaks the pointless indignity that Gail Atwater suffered with the mantle of reasonableness. I respectfully dissent.