The STATE of Ohio, Appellee,

v.

JONES, Appellant.

[Cite as *State v. Jones*, 154 Ohio App.3d 231, 2003-Ohio-4669.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 82133.

Decided Sept. 4, 2003.

232

William D. Mason, Cuyahoga County Prosecuting Attorney, and Maureen E. Clancy, Assistant Prosecuting Attorney, for appellee.

Donald Butler, for appellant.

---

MICHAEL J. CORRIGAN, Presiding Judge.

{¶ 1} Defendant Carol A. Jones filed a motion to suppress evidence of drugs seized from her. She maintained that the police lacked a reasonable suspicion that she had engaged in criminal activity, and further argued that the police conducted an illegal strip search of her in the field. After the court denied the motion to suppress, Jones pleaded no contest to charges of possession of drugs, trafficking in drugs, and possession of criminal tools. The court found Jones guilty, and this appeal followed.

{¶ 2} When reviewing the court's ruling on a motion to suppress, we give the court's factual findings great deference. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Our review of the facts as applied to the law is not

deferential, however, but independent. *Ornelas v. United States* (1996), 517 U.S. 690, 696–699, 116 S.Ct. 1657, 134 L.Ed.2d 911; *State v. Retherford* (1994), 93 Ohio App.3d 586, 592, 639 N.E.2d 498.

{¶ 3} An undercover narcotics detective testified that he had been deployed because of complaints about drug dealing. At around midnight, the detective saw a vehicle driven by Jones pull up to a person waiting for the vehicle's arrival. With cupped hands, Jones displayed something for the person. He saw the person take money from a pocket and exchange it for what Jones held in her hand.

{¶ 4} The detective went on to witness a second transaction that was identical in form to the first transaction.

{¶ 5} Jones then drove her car to another location and exchanged words with the driver of another car. The two vehicles left together and went to Jones's house. The detective knew Jones's address from having conducted an earlier investigation into her conduct. The second driver stayed for about five minutes, then both Jones and the second driver left separately. The detective continued his surveillance and saw Jones engage in a third hand-to-hand transaction.

{¶ 6} At this point, the detective decided to make an investigatory stop pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Because he wished to protect the anonymity of the vehicle he was using, the detective called for a uniformed officer to make the stop. The uniform officer did not testify at the suppression hearing, but a female officer who responded to a radio call for patdown said that she responded to conduct the patdown.

{¶ 7} Jones was wearing sweat pants with an elastic waistband. As the female officer tried to conduct the patdown, Jones squirmed and tried to pull away. When the female officer grabbed the waistband of Jones's sweat pants to keep her from pulling away, she saw a plastic bag stuck halfway into the waistband of Jones's undergarments. The plastic bag held a "chunk" that the officer believed was crack cocaine.

{¶ 8} The officer did not have any latex gloves handy, so her partner hand-cuffed Jones and placed her in the cruiser for transportation to the jail and an appointment with the matron. As the officers discussed who would transport Jones, the female officer looked into the cruiser and saw that Jones had slipped her left hand out of the handcuffs and had it in her pants. The officers removed Jones from the car and recuffed her. They patted down Jones and searched the back of the car for the plastic bag, but could not find it. The female officer thought that the plastic bag might have fallen around Jones's ankles, so she asked Jones to sit in the open car with her feet on the sidewalk. When Jones continued to resist, the officer told Jones to lie down on the car seat. As Jones

scooted back on the seat, the friction between the seat and her sweat pants caused her sweat pants to slide down to her ankles. The officer checked the leggings of the sweat pants but did not find any drugs. She concluded that Jones had secreted the drugs in her person.

{¶ 9} The police took Jones to the police station. They called on the matron to perform a strip search. The matron asked Jones if she "had anything on you. You might as well take it out now, if you have anything on you." Jones reached into the front of her sweat pants and removed a bag containing drugs. Jones also carried three cell phones and $800 in cash.

{¶ 10} Jones's fiancé and brother-in-law testified that they had both seen Jones's arrest. The fiancé said that as Jones was handcuffed in the police cruiser, the female police officer had Jones "disrobed from the waist down" and was telling her to spread her legs. The brother-in-law said that he saw the police walking Jones, and she was wearing only a T-shirt. He conceded that it was a long T-shirt and that he could not tell whether she was clothed beneath the T-shirt.

{¶ 11} The court found that the detective's observations "provided more than reasonable suspicion" to conduct a *Terry* stop. The court further found that the female police officer had probable cause to seize the contraband. The court did not resolve the question of fact concerning Jones's argument that she had been strip-searched in the police cruiser because it did not believe it to be relevant to the motion to suppress.

I

{¶ 12} Jones makes three substantive arguments as to why the court erred by denying her motion to suppress. She argues (a) that the police could not stop and detain her based on the detective's "bald request" for a stop when those officers lacked any independent basis for believing that Jones had engaged in criminal activity prior to the stop, (b) the circumstances of strip search were impermissible, and (c) the illegality of the stop rendered Jones's tender of the drugs involuntary and thus inadmissible.

A

{¶ 13} Under *Terry*, a police officer may briefly stop and detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that "criminal activity may be afoot," even if the officer lacks probable cause to make an arrest. We look at the totality of the circumstances to determine whether the police officers had a particularized and objective basis for suspecting that Jones was engaged in criminal activity.

*United States v. Arvizu* (2002), 534 U.S. 266, 122 S.Ct. 744, 749–750, 151 L.Ed.2d 740. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Arvizu*, 534 U.S. 266, 122 S.Ct. at 750, 151 L.Ed.2d 740, quoting *United States v. Cortez* (1981), 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621.

{¶ 14} In *State v. Paul* (Feb. 14, 2002), Cuyahoga App. No. 79596, 2002 WL 228848, we stated:

{¶ 15} "We have consistently found a reasonable suspicion of criminal activity exists in cases where the accused engages in exchanges of money for small objects. See, e.g., *State v. Ricks* (Sept. 28, 2000), Cuyahoga App. No. 76670 [2000 WL 1429432], unreported (suspects flagged down and approached cars, then appeared to be exchanging something for money); *State v. Rogers* (May 21, 1998), Cuyahoga App. Nos. 72736 and 72737 [1998 WL 269085], unreported (exiting car and cupping hands to show something, then exchanging money); *State v. Streeter* (July 2, 1992), Cuyahoga App. No. 62682 [1992 WL 159656] (same). Cf. *State v. Barr* (1993), 86 Ohio App.3d 227, 620 N.E.2d 242 (although not citing to *Terry*, police observed offender exchange what appeared to be money for drugs and found probable cause for arrest)."

{¶ 16} The undercover detective said that he watched Jones engage in three different transactions, all of which involved Jones displaying to other persons something in her cupped hands, and the other persons exchanging currency for what she held in her hands. This fact pattern is entirely consistent with *Paul* and the cases cited therein and amply supports the court's finding that the undercover officer formed a reasonable suspicion that Jones engaged in criminal activity.

B

{¶ 17} During the suppression hearing, the female officer who conducted Jones's patdown conceded that she had not been told of the circumstances behind the *Terry* stop and simply responded to the call to pat down a female suspect. Jones argues that the officers who detained her did so illegally because the undercover detective failed to convey to the patrol officers the basis for the investigative stop.

{¶ 18} Once the undercover detective formed a reasonable suspicion that Jones had been engaging in criminal activity, he could validly ask other officers to conduct the *Terry* stop in order to protect his anonymity. In turn, those other officers could perform the *Terry* stop for the undercover detective. In *State v.*

*Williams,* Cuyahoga App. No. 81364, 2003-Ohio-2656, 2003 WL 21196678, we stated at ¶ 10:

{¶ 19} "Reasonable suspicion, however, need not be based only on an officer's personal observations. *Adams v. Williams* (1972), 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612. The officer may rely on information gleaned from other valid sources, such as other officers or a police radio dispatch. *United States v. Hensley* (1985), 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604. This principle is rooted in the notion that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.' Id. at 231, 105 S.Ct. at 682, 83 L.Ed.2d at 614, quoting *United States v. Robinson* (C.A.9, 1976), 536 F.2d 1298, 1299. When a dispatch is involved, therefore, the officer who conducts the initial stop will typically have very little knowledge of the facts that prompted his or her fellow officer to issue the dispatch.

{¶ 20} "The United States Supreme Court has reasoned, then, that the admissibility of the evidence uncovered during such a stop does not rest upon whether the officers relying upon a dispatch 'were themselves aware of the specific facts which led their colleagues to seek their assistance.' It turns instead upon whether the officer who issued the dispatch possessed reasonable suspicion to make the stop. Id. at 231 [105 S.Ct. 675, 83 L.Ed.2d 604]. Thus, if a dispatch was issued in the absence of reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment. *Hensley,* 469 U.S. at 232 [105 S.Ct. 675, 83 L.Ed.2d 604]."

{¶ 21} As described in *Williams,* the law does not require that police officers responding to a request for assistance be aware of the "specific facts" prompting the request. The undercover detective testified at the suppression hearing and fully detailed the facts that gave rise to his suspicion that Jones had been trafficking in drugs. With that basis established in evidence, the officers who responded to his call for assistance were not obliged to have the same knowledge of the situation that he possessed.

{¶ 22} We stress that unlike the panel decision in *Williams,* this is not a case where police officers were dispatched on the basis of an informant's report. Instead, the officers were dispatched on information provided by one of their own, an undercover detective who testified that he had spent ten years on the force and worked in the narcotics unit for about 18 months. He claimed to have made "innumerable" narcotics arrests. The court had no reason to doubt that the detective's experience in the field gave him ample qualifications to determine

that Jones had been engaging in trafficking based upon the hand-to-hand transactions that he witnessed.

## C

{¶ 23} Finally, Jones claims that the court's findings of fact were deficient because they did not articulate a basis for denying her motion to suppress on the issue of whether the undercover detective communicated to the officers called to the scene his reasons for requesting the *Terry* stop.

{¶ 24} Crim.R. 12(F) states that when a court makes a ruling on a motion in which factual issues are involved in determining the motion, the court must "state its essential findings on the record." Despite this language, the rule is not self-executing as to findings of fact. In *State v. Eley* (1996), 77 Ohio St.3d 174, 179, 672 N.E.2d 640, the Ohio Supreme Court held that former "Crim.R. 12(E) does not control because Eley did not request factual findings. 'In order to invoke the rule, the defendant must request that the court state its essential findings of fact in support of its denial of a motion.' Eley's failure to invoke the rule waived any error." (Citations omitted.)

{¶ 25} Jones did not make a request for findings of fact, so she must be deemed to have waived the right to argue any error.

{¶ 26} Even had Jones preserved the error for appeal, we would not find the court's failure to state any factual findings on the issue to be error. The requirement that the court make findings of fact is to enable a reviewing court to understand the basis for the court's decision. *Davis v. Wilkerson* (1986), 29 Ohio App.3d 100, 101, 29 OBR 112, 503 N.E.2d 210. Given the specific arguments raised in the motion to suppress, the basis for the court's rulings is apparent to us.

## II

{¶ 27} Jones argues that the court erred by refusing to find that the police conducted an illegal strip search of her person in the field. Although the female police officer testified that Jones's undergarments were not removed, Jones's fiancé testified that he saw Jones standing outside the police cruiser "disrobed from the waist down." Jones argues that her fiancé's testimony showed that her sweat pants had been removed while in the police cruiser, and that a strip search had been done. The court appeared to have difficulty reconciling the evidence on this point, for it stated that "we will never know whether or not the pants were on the Defendant, totally off the Defendant, on the car. In any event, I don't believe that is relevant for purposes of whether or not this evidence should be suppressed."

{¶ 28} We assume that the court decided that the resolution of the question whether Jones had been strip-searched was irrelevant because even had a strip search been conducted, it would have amounted to a statutory, not constitutional, violation to which Fourth Amendment exclusion of evidence would not apply.

{¶ 29} In *Kettering v. Hollen* (1980), 64 Ohio St.2d 232, 234–235, 18 O.O.3d 435, 416 N.E.2d 598, the Supreme Court stated: "The exclusionary rule has been applied by this court to violations of a constitutional nature only." It went on to hold that "[i]t is clear * * * that the exclusionary rule will not ordinarily be applied to evidence which is the product of police conduct violative of state law but not violative of constitutional rights." In *State v. Jones* (2000), 88 Ohio St.3d 430, 727 N.E.2d 886, the Supreme Court held that the rule about violations of statutory rights not giving rise to the exclusion of evidence was not absolute. It found that a full custodial arrest for a minor misdemeanor violated the Fourth Amendment, even though the arrest was only a violation of statute. The validity of this holding may be in question, however, as in *Atwater v. Lago Vista* (2001), 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549, the United States Supreme Court rejected the idea that a full custodial arrest for the violation of a misdemeanor violated the Fourth Amendment. See *State v. Weideman,* 94 Ohio St.3d 501, 764 N.E.2d 997, 2002-Ohio-1484, 764 N.E.2d 997 (Cook, J., concurring in judgment only). We agree with Justice Cook's concurring opinion and believe that *Jones* cannot be considered viable precedent. The Ohio Supreme Court decided *Jones* on the basis of United States Supreme Court precedent, not Ohio precedent. Because it did not set forth an independent basis for its decision under the Ohio Constitution, we believe that the Ohio Supreme Court would likely disapprove of its holding in *Jones,* at least insofar as it relied on federal law as a basis for its decision.

{¶ 30} R.C. 2933.32(A)(2) defines a "strip search" as:

{¶ 31} "[A]n inspection of the genitalia, buttocks, breasts, or undergarments of a person that is preceded by the removal or rearrangement of some or all of the person's clothing that directly covers the person's genitalia, buttocks, breasts, or undergarments and that is conducted visually, manually, by means of any instrument, apparatus, or object, or in any other manner while the person is detained or arrested for the alleged commission of a misdemeanor or traffic offense."

{¶ 32} A law enforcement officer may conduct a strip search if that officer "has probable cause to believe that the person is concealing evidence of the commission of a criminal offense, including fruits or tools of a crime, contraband, or a deadly weapon * * *." See R.C. 2933.32(B)(2). There are, of course, serious

limitations to how the police may carry out strip searches.  In *Hidey v. Ohio State Hwy. Patrol* (Sept. 22, 1998), Franklin App. No. 97API12–1587, 1998 WL 655277, the Tenth District Court of Appeals stated:

{¶ 33} "R.C. 2933.32 places express limitations on the manner in which strip searches are to be conducted.  First, unless there is a valid medical emergency, a warrant must be obtained authorizing the search.  Thus, probable cause to believe that the person is concealing evidence of the commission of a criminal offense is required.  R.C. 2933.32(B)(2).  Second, the permission of the individual in command of the law enforcement agency must also be obtained prior to a search.  R.C. 2933.32(B)(5).  Provided a warrant is issued and permission obtained, the search must be performed by a person of the same sex, in a manner and in a location that permits only the person or persons who are physically conducting the search and the person who is being searched to observe.  R.C. 2933.32(B)(6)."

{¶ 34} The court's disinclination to resolve the evidentiary conflict between Jones's fiancé and the police officer who conducted the patdown likely meant that it believed that even had a strip search been conducted in violation of R.C. 2933.32(B), that violation did not rise to the level of constitutional error.  We agree that no constitutional violation arose because a unique level of urgency arose when Jones freed one hand from the handcuffs and placed it in her sweat pants.  The female police officer would have been justified in thinking that Jones was trying to hide evidence.  Under these circumstances, the police officer acted properly to prevent the destruction of evidence, a step asserting a legitimate governmental interest that outweighs the intrusion into Jones's liberty.

### III

{¶ 35} Finally, Jones argues that her act of handing the contraband to the jail matron after being brought in for a body-cavity search did not render her compliance consensual, nor did it negate the legality of the initial stop.

{¶ 36} To the extent that this argument questions the validity of the initial stop, we reject it for the reasons previously stated.

{¶ 37} As to the voluntary nature of her handing over the drugs, we find that Jones did not raise this as an issue in her motion to suppress.  *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889, paragraph one of the syllabus, states that an accused who seeks the suppression of evidence obtained during a warrantless search or seizure must "raise the grounds upon which the validity of the search or seizure is challenged in such a manner as to give the prosecutor

notice of the basis for the challenge." See, also, *State v. Davis* (Mar. 14, 2002), Cuyahoga App. No. 79771, 2002 WL 407895.

{¶ 38} Jones's motion to suppress did not raise the voluntariness of her act of handing the drugs to the matron—she raises it for the first time on appeal. We therefore decline to address it.

Judgment affirmed.

ANN DYKE, J., concurs.

ANNE L. KILBANE, J., dissents.

ANNE L. KILBANE, Judge, dissenting.

{¶ 39} On this appeal from an order of Judge Carolyn B. Friedland that denied Carol A. Jones's motion to suppress, I dissent. The report of the undercover narcotics detective, Cleveland Police Detective Ricardo Ruffin, expressly states that he personally requested a female officer to assist with the investigative stop because:

> "[I]n this officers [sic] experience as a police officer it is known that female street level drug dealers often attempt to conceal narcotics from law enforcement officials by placing suspected narcotics underneath their clothing so that male law enforcement officers cannot detect them during pat down situations.[1]"

{¶ 40} Police officers can properly conduct investigative searches to ensure their own safety when briefly detaining a suspect for questioning,[2] and if evidence of crime is detected during a properly conducted search, it will not be suppressed.[3] Unfortunately, the *Terry* doctrine, which began solely as a means to aid officer safety when questioning individuals,[4] has been abused by law enforcement officers who employ it as a means to detect crime through searches of individuals, thus forcing judges to make hard decisions balancing the officer's need for safety against the individual's right to privacy.[5]

---

1. Det. Ruffin's "Departmental Information" report of the arrest of Carol Jones to Sgt. James Lewis, dated Mar. 12, 2002.

2. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

3. Cf. *Minnesota v. Dickerson* (1993), 508 U.S. 366, 378, 113 S.Ct. 2130, 124 L.Ed.2d 334.

4. *Terry*, 392 U.S. at 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 ("The sole justification of the search * * * is the protection of police officer and others nearby * * *.").

5. That the search produced evidence of criminal conduct makes it doubly difficult.

{¶ 41} There is little practical doubt that investigative stops are frequently used to conduct *Terry* searches that are designed to find drugs rather than ensure an officer's safety. Rarely, however, is a detective so frank that he will admit the tactic in his police report. Through it, he admits that the female police officer was contacted as a means of enhancing the search for narcotics instead of aiding a male officer's weapons search. Moreover, even though this issue was not raised at trial or on appeal, the detective's report is extraordinary and justifies a finding of plain error.[6]

{¶ 42} Not only does the detective's report expressly admit that protective searches are routinely used as evidentiary searches, the circumstances of the stop also show that Jones was stopped not for questioning but to be searched. The detective did not intend to question her at the scene after she was stopped, the officers on the scene who would have been capable of questioning her did not testify, and there is no indication that they had any substantial part in the stop. Officer Martina Latessa, the only officer at the scene who testified, stated that she had no knowledge of Jones's activities and was called solely to conduct the *Terry* search. Under these circumstances there can be no claim that the suspect was being detained for brief questioning, as was the case in *Terry*,[7] because there is no indication that the officers who stopped Jones intended to ask any relevant questions concerning her conduct.[8]

{¶ 43} The state failed to carry its burden of proving the search lawful[9] because the evidence showed that the stop was made solely for the purpose of conducting the search, instead of the search being conducted as a means of protecting the officer after making a valid stop for questioning.[10] There is no reason to make an investigatory stop if the police are not going to make an investigation, and stopping a suspect for a *Terry* search alone is not a proper "investigation."

---

6. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

7. *Terry*, 392 U.S. at 29–30, 88 S.Ct. 1868, 20 L.Ed.2d 889.

8. I note, however, that while I disagree with the majority's suggestion that any officer can carry out a *Terry* stop even if uninformed of the reasons for suspicion, the record is sufficient to show that officers present at the stop had adequate information to question Jones about her conduct. Detective Ruffin testified that he spoke directly to the patrol officer who initially had stopped Jones and told him of the reasons for the stop, and that he also spoke directly to another detective who arrived on the scene after the stop. Nevertheless, the detective's report and the remaining circumstances show that the stop was not based upon a desire to question Jones, but to search her.

9. *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889, paragraph two of the syllabus.

10. *Terry*, supra.

{¶ 44} I also disagree with the extent of the majority's deference to the judge's factual findings. Even though those findings are entitled to considerable deference, this standard should not be used as an excuse to accept all factual findings without regard to their unlikelihood.[11] Although I do not credit the testimony of Jones's witnesses because of their relationship to her, the testimony of Officer Latessa, who conducted the *Terry* search, also lacked credibility.

{¶ 45} She first testified that Jones did not cooperate in the pat-down weapons search and that she grabbed the waistband of Jones's sweat pants to keep her from pulling away. She stated that although she saw a plastic bag containing suspected drugs at that time, she did not remove the bag immediately because she did not have latex gloves. This justification might be acceptable, even though unlikely, if the remaining facts were straightforward, but they are not. Therefore, the failure to seize the bag immediately deserves further scrutiny.

{¶ 46} Pulling suspected contraband from a waistband does not immediately strike one as requiring latex gloves—this area is not so immediately adjacent to anal and genital cavities that one would consider latex gloves absolutely necessary, and it seems likely that officers routinely remove things from waistband areas without such protection. Furthermore, even if the bag was not seized as soon as it was seen, it would seem reasonable for the officer to remove the bag as soon as Jones was handcuffed and less able to resist. At that point, the lack of latex gloves should not have been an issue even if one believed them necessary, because one would expect patrol cars to carry such equipment for first aid purposes.

{¶ 47} Therefore, although Officer Latessa's actions could be viewed as an acceptable variation from normal police conduct, her failure to remove the suspected drugs when they were first observed raises a suspicion about her credibility. This suspicion is heightened when one considers the testimony that Jones was wearing a shirt that extended below her waistline at the time.[12] It is difficult to understand how Officer Latessa could have seen the drugs when she pulled the waistband of Jones's shorts—either the shirt was tucked into the sweat pants, allowing the waistband to be pulled but covering the waistband of the underwear, or the shirt was untucked, obstructing the waistbands of both the sweat pants and the underwear.

---

11. *State v. Harris* (1994), 98 Ohio App.3d 543, 546, 649 N.E.2d 7 (factual findings entitled to deference only when supported by competent, credible evidence).

12. This testimony was revealed during cross-examination of Jones's brother-in-law, who testified on her behalf. Although I do not otherwise rely on the testimony of Jones's witnesses, the majority has also noted this testimony, and its neutrality and plausibility tend to make it worthy of credence.

{¶ 48} Officer Latessa's credibility is further undermined by her testimony concerning the removal of Jones's sweat pants. She first testified that Jones's pants were never below her knees. On cross-examination, however, she admitted that Jones's pants came down to her ankles, and then admitted that they came off completely. She testified that she examined the pants and then assisted Jones in putting them back on. Even though my dissent is not specifically concerned with Jones's being disrobed at the scene, Officer Latessa's inconsistent testimony concerning the events of the search casts doubt upon her entire testimony, and most critically casts doubt upon her testimony that she saw a bag of suspected drugs in Jones's possession, even though she did not remove the bag at the time she saw it.

{¶ 49} The factual questions about when the bag was observed are too great to ignore, and the lawfulness of the officers' subsequent conduct all depends on the validity of that testimony. Despite some inconsistent testimony about the officers' subjective perceptions, Jones was objectively under arrest when she was first handcuffed at the scene and placed in the zone car.[13] The only legitimate basis for that arrest is the probable cause provided by Officer Latessa's alleged observation of contraband. The facts call her observation into serious question, which necessarily impugns the legitimacy of Jones's detention and the officers' subsequent searches. The deference given to factual findings cannot reconcile the inconsistencies here, and the state has failed to meet its burden.[14]

{¶ 50} Because Officer Latessa's version of events is not viable, and because Detective Ruffin's report admits that the search for drugs was conducted under the guise of a *Terry* stop, the motion to suppress should have been granted.

{¶ 51} I would reverse.

---

13. See, e.g., *State v. Nelson* (1991), 72 Ohio App.3d 506, 508–509, 595 N.E.2d 475 (finding of intent to arrest is based on objective manifestations). Once handcuffed, the officers were not going to release Jones until searching her thoroughly for contraband.

14. *Xenia v. Wallace*, supra.