**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 6, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ERIK BOCHOVE; ELAINE
BOCHOVE, individually and as
parents of CONRAD BOCHOVE,
their minor son,

      Plaintiffs-Appellants,

  v.

VILLAGE OF CORRALES, Corrales
Police Department; MICHAEL
TARTAR, Chief of Police of the
Village of Corrales; OFFICER TIM P.
FRAZER; OFFICER JERRY SOSA,
individually and in their official
capacities,

      Defendants-Appellees.

No. 04-2217
(D.C. No. CIV-03-219 MCA/RLP)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **EBEL**, and **MURPHY**, Circuit Judges.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiffs appeal from the district court's order directing a verdict in favor of defendants on several of their claims. They also claim that the court erred in excluding evidence that criminal charges against Elaine Bochove were dropped. Separately, plaintiff Elaine Bochove appeals the jury verdict returned in favor of defendants Tim P. Frazer and Michael Tartar on her claims of excessive force and failure to adequately supervise, respectively. She also claims that the jury was improperly instructed on the legality of her arrest. We affirm for the reasons explained below.

**Background**

The events giving rise to this lawsuit began late on Saturday, February 24, 2001, in the Village of Corrales, New Mexico. Plaintiffs Erik Bochove and Elaine Bochove had agreed to host a party that evening at their home for their thirteen-year-old son, plaintiff Conrad Bochove, and his friends.

Erik Bochove testified that at about 10:00 p.m. on the night of the party, he "saw a rather tall, somewhat hefty girl with a mop" in the hallway of his home "and I may have been told by her or by somebody else that somebody had puked there, and that was about it." Aplt. App. Vol. 3 at 386. He testified that he did not do anything, because "the party was supposed to be over," and he turned his "attention to getting the kids out of the house." *Id*. at 387. He went to Conrad's bedroom where he saw a couple of girls, one of whom was sitting on the bed: "I especially didn't want any girls coming to the house . . . and after the mopping

incident and everything, I became suspicious." *Id*. at 387-88. So he went to the kitchen and "waited for the children to go home." *Id*. at 388. The next thing he recalled was Conrad coming out of his bedroom sometime between 11:00 and 11:30 p.m., "carrying another boy" who "seemed to be passed out." *Id*. at 388, 390. During a hurried and confused conversation, Conrad told him "that [the boy] had been drinking at his [own] house." *Id*. at 389. Mr. Bochove told Conrad to "put him in the car and I'll drive him home." *Id*. at 390.

The boy turned out to be a neighbor, and Conrad's twelve-year-old schoolmate, Kyle. Kyle's parents were just returning from an evening out when Erik Bochove arrived with their son passed out in the backseat of the Bochove's car. Kyle's father testified that when he and his wife came home about midnight or 12:30 a.m., his son was missing. Accounts differ at this point. Kyle's father testified that their doorbell rang almost immediately and Conrad told them "that something terrible has happened to Kyle." Aplt. App. Vol. 4 at 616. They rushed to the Bochove's car and found him unconscious. After they carried him inside, Kyle's mother, a nurse, was unable to revive him. They also noticed that he was missing some clothing, in particular his underwear. On the other hand, Erik Bochove and Conrad testified that Kyle's parents were in the driveway when they pulled up and immediately took Kyle inside without asking any questions. In any event, the relevant point is that neither Kyle's parents nor any of the defendants knew where or how Kyle became unconscious and lost his underwear.

-3-

Uncertain as to how to receive the quickest emergency response, Kyle's parents contacted their neighbor and friend, Chief Tartar, who told them to call 911 and the response would come directly from Corrales. When Chief Tartar arrived at Kyle's home a few minutes later, he found Kyle lying on his back in the entryway: "I could see that his face was pale, his lips appeared to be dark, maybe blue, his hair was wet and I could see that he was breathing . . . and could smell [a] faint odor of some type of alcoholic beverage . . . on his breath." Aplt. App. Vol. 2 at 230. While waiting for the ambulance, he learned from Kyle's parents that Conrad and Erik Bochove had just dropped off an unconscious Kyle at their home. Officers Frazer and Jerry Sosa were immediately dispatched to the Bochove residence.

Erik Bochove admitted that after he and Conrad dropped off Kyle, he returned home because his "mind was on the other kids at that point. I wanted to get back immediately." Aplt. App. Vol. 3 at 392.[1] He testified that as soon as

[1] While driving home, Conrad told his father what had happened to Kyle. While at Conrad's party, Kyle suggested that some of the other children come to his house because his parents were out for the evening. Several children, including Conrad, went to Kyle's house and began drinking alcoholic beverages. At some point Kyle began to lose consciousness and Conrad called his house and arranged for a high school guest to pick them up. Conrad sneaked Kyle into the Bochove home and described his efforts to hide Kyle from his parents through the remainder of the party: "So I made sure [my parents] weren't around, and I brought Kyle in through my front door, and I put him in my bed. And he threw up again in my room." Aplt. App. Vol. 2 at 273. "I thought he had alcohol poisoning. I was like scared really." *Id*. at 273-74. "But I tried putting him in

(continued...)

-4-

they got home he told his wife what had happened and then "went right away to [Conrad's] bedroom, and again told the kids to get out." *Id.* For his part, Conrad testified that as soon as he got home he went to his bedroom where he and his remaining guests "started . . . smoking mad cigarettes and a lot of pot." Aplt. App. Vol. 2 at 282.

Erik Bochove was in the kitchen when Officers Frazer and Sosa arrived a short time later. Relevant to the claims in this lawsuit, Mr. Bochove admitted that the officers told him that Kyle had just been dropped off from Conrad's party and was barely breathing. They told Mr. Bochove and his wife, who had now joined him at the door, that "they came to the house to observe the children and check on their safety." Aplt. App. Vol. 3 at 394.

Elaine Bochove and Erik Bochove testified that they did not invite the officers inside, although Mrs. Bochove testified that she went to Conrad's bedroom and told them: "'Kids, please come out, go to the living room. The police want to see if you have some kids hurt,'" *id.* at 496, which supports Officers Frazer's and Sosa's testimony that she told them to come inside and that

---

[1](...continued)
the shower and tried throwing water and tried slapping [him] around and tried everything I could to wake him up, and he wouldn't wake up. Then I took him back into my room, and I put his clothes back on him because I took his clothes off to put him in the shower." *Id.* at 274-75. Erik Bochove and Elaine Bochove testified that they never knew that Conrad had left the party or that Kyle was in their home.

-5-

she would get Conrad and the children. In any event, Officer Frazer testified that when they stepped inside the Bochove's home, he "saw at least a dozen children just flooding from [Conrad's] room going every single direction, some toward the back door, some towards the living room and I noticed an odor of burning marijuana coming from the bedroom." Aplt. App. Vol. 2 at 102. Officer Frazer followed Mrs. Bochove to the door of the bedroom and asked to look inside Conrad's bedroom. Mr. Bochove testified that as his wife walked towards the bedroom "Officer Frazer followed her . . . and she turned around and barred the way. I think Officer Frazer asked to be let into the room . . . . She refused." Aplt. App. Vol. 3 at 395. Mrs. Bochove described the encounter with Officer Frazer as follows: "'Ma'am, do you mind if I look inside your son's bedroom?' I told him, 'Oh, yes, I mind.' And I stayed in front of the door, and *they*[2] closed the door behind me. And he told me, 'Ma'am, if you don't allow me to see the bedroom, I will put you under arrest.'" Aplt. App. Vol. 3 at 498 (emphasis added).

When Officer Frazer attempted to handcuff Elaine Bochove and place her under arrest, she screamed in pain. He stopped trying to handcuff her and asked Officer Sosa to take her to the kitchen to wait for the paramedics to arrive. After

_____

[2]    The "they" who Elaine Bochove testified closed the door behind her apparently refers to one boy and two girls who crawled out the bedroom window. The girls, clad only in their underwear and low-cut tee-shirts, came back inside the house shortly after Chief Tartar arrived.

Officer Frazer checked Conrad's bedroom, he heard a commotion in the kitchen and found Mrs. Bochove wandering around and screaming at them to leave her house. As soon as he approached her to get her seated, she "bolted" for her bedroom and locked the door behind her. Aplt. App. Vol. 2 at 119. Erik Bochove described his wife's actions as: "I think she escaped and locked herself in the bedroom." Aplt. App. Vol. 3 at 396. When Mrs. Bochove refused to unlock the door, Officer Frazer kicked it in and again tried to place her in handcuffs. Mrs. Bochove, who was described by her husband as "quite hysterical" at this point, Aplt. App. Vol. 3 at 396, resisted the arrest and also tried to bite Officer Frazer. By now, Chief Tartar had arrived and they escorted her back to the kitchen for examination by the paramedics, who found no injuries. To effectuate the arrest, Officer Frazer asked Mrs. Bochove to come outside and help him look for liquor bottles. She put on a coat and went outside. Again, accounts differ. Mrs. Bochove testified that for the first time that evening she believed that they were trying to arrest her. She said that Officer Frazer put his hand on her shoulder and threw her to the ground. Officers Frazer and Sosa testified that as soon as they attempted to take her into custody she fell to the ground and began screaming. This time, they did subdue her and she was transported to the police station.[3]

---

[3] When Officers Frazer and Sosa arrived at the police station, Elaine Bochove continued to complain of injuries and was taken to an emergency room. The emergency room physician found no significant injuries and testified that he

(continued...)

Chief Tartar remained at the Bochove home until all of the parents had come to take their children home. During this process, he confirmed that several of them were intoxicated.

Elaine Bochove was released from police custody early the next morning. She was charged with obstructing a police officer and attempted battery on a police officer. These charges were later dropped by prosecutors.

**The District Court Proceedings**

Plaintiffs' lawyers filed an eight-count complaint asserting a myriad of alleged civil rights violations under 42 U.S.C. § 1983 and state law, for which they sought money damages. The Bochove family claimed that defendants violated their federal Constitutional and state law rights rights when they entered their home "without warrant, probable cause, permission or consent," Aplt. App. Vol. 1 at 28, and that they remained in their home "greatly in excess of any period of time required for legitimate police business," thereby wrongfully depriving them of "the lawful possession, use and enjoyment of their residence." *Id.* at 31. individually, Elaine Bochove claimed that she was wrongfully arrested and detained, and that defendants used excessive force during the arrest. All of the Bochoves alleged that the failure to "adequately train and supervise" Officers

---

[3](...continued)
thought maybe she "was acting." Aplee. Supp. App. at 5.

Frazer and Sosa resulted in the alleged violations of their rights, *id*. at 34, and they also sought punitive damages against Officer Frazer and Chief Tartar.[4]

A jury trial was held from July 26, through July 30, 2004. Prior to trial, the district court granted defendants' motion in limine to exclude any evidence, testimony, or argument that the charges originally brought against Elaine Bochove were not prosecuted. Also, at the close of all of the evidence, the district court directed a verdict in favor of defendants on all of plaintiffs' claims except Elaine Bochove's claims of excessive force and punitive damages against Officer Frazer, and the failure to adequately supervise against Chief Tartar. The jury returned verdicts in favor of Officer Frazer and Chief Tartar and judgment was entered on the verdicts. This appeal followed.

**Directed Verdict**

Plaintiffs' contention that the district court erred in directing a verdict on certain of their claims because there were disputed facts that should have been resolved by the jury is unsubstantiated because none of their statements or arguments are supported by references to the record; instead, their opening brief contains a twelve-page section titled "Statement of the Case," which plaintiffs concede is "taken from [their] complaint." Aplt. Opening Br. at 3. According to

---

[4] Plaintiffs' eighth claim for relief requested class certification of their allegations against the Village of Corrales Police Department for harassment of certain individuals. Plaintiffs voluntarily dismissed their claims for class certification and punitive damages against Chief Tartar.

plaintiffs, "to conserve resources, citations to the record are not included in this section. However, relevant findings by the [district court] are discussed in the 'Material Facts' section[], and some citations to the transcript of testimony are included therein." *Id*. This statement, however, is incorrect; instead their section titled "Disputed and Undisputed Material Facts," is a one-man colloquy that does not contain any references to the record.

Standing alone, plaintiffs' failure to support their arguments with references to the record is sufficient grounds on which to affirm the district court's directed verdict. The Federal Rules of Appellate Procedure are clear that the brief must contain "a statement of the facts relevant to the issued submitted for review with appropriate references to the record." Fed. R. App. P. 28(a)(7). Likewise, the argument in the brief "must contain contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies." *Id.* 28(a)(9); *see also SEC v. Thomas*, 965 F.2d 825, 827 (10th Cir. 1992) (affirming the district court's order enjoining the defendant's securities and antitrust violations because his brief failed "to provide this court with the essential references to the record to carry his burden of proving error.")

This requirement is not a matter of form over substance. "We review a district court's grant of a motion for directed verdict de novo." *Tanberg v. Sholtis*, 401 F.3d 1151, 1156 (10th Cir. 2005). As part of this review, we must determine whether during a jury trial "a party has been fully heard on an issue and there is no

legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). Because plaintiffs have failed to cite any evidence, we cannot conduct the required review and must defer to the district court's ruling. *See Thomas*, 965 F.2d at 827.

Despite this obstacle, we nonetheless have painstakingly reviewed the four-volume trial transcript and the district court's twenty-page oral ruling on the motion for a directed verdict. We are convinced that the district court correctly directed a verdict where appropriate and sent the remaining claims to the jury.[5]

### Motion in Limine

Plaintiffs' next assignment of error concerns the district court's order precluding them from presenting any evidence, testimony, or argument that the charges for which Elaine Bochove was arrested were eventually dismissed. They argue that because their claims must be analyzed under the "totality of the circumstances," citing *Graham v. Connor*, 490 U.S. 386 (1989), the in limine order prevented the jury from assessing all of the circumstances "surrounding all of the events giving rise to this litigation." Aplt. Opening Br. at 37. Plaintiffs also claim, again without any citation to the record, that the charges were dismissed "for lack of evidence." *Id*.

---

[5]    Our "Background" section was prepared from the trial transcript and includes testimony primarily from plaintiffs.

In a well-reasoned five-page written order, the district court explained its reasons for excluding this evidence. We review evidentiary rulings excluding evidence for an abuse of discretion. *Tanberg*, 401 F.3d at 1162. Under an abuse of discretion standard a trial court's decision will not be disturbed unless "we have a firm and definite belief that the trial court made a clear error of judgment." *Id*. Setting aside the fact that events that took place *after* the conduct complained of obviously have nothing to do with the "totality of the circumstances," plaintiffs have not demonstrated any error whatsoever, let alone an abuse of discretion.

**Jury Instruction**

Plaintiffs also claim that the district court erred when it instructed the jury on the excessive force claim that Elaine Bochove's arrest was legal. As part of this argument, they contend that the district court erred in directing a verdict in favor of defendants on her claim for unlawful arrest and detention on the basis of qualified immunity. We disagree.

Here, the district court ruled: "I note that the plaintiffs did not submit a jury instruction for the Court's consideration on [the unlawful arrest and detention] claim and have not pointed to any authority with respect to the law on this particular claim. I find that defendants are entitled to qualified immunity on this claim and that will be dismissed." Aplt. App. Vol. 5 at 899.

To defeat a defense for qualified immunity on a § 1983 claim, a plaintiff "must establish that [a defendant's] action in arresting [her] violated [her]

-12-

constitutional rights and that the rights violated were clearly established at the time of the arrest . . . . We review the district court's decision de novo." *Tanberg*, 401 F.3d at 1159.

"[A] warrantless arrest is lawful under the Fourth Amendment if there is probable cause to believe that the person arrested has committed an offense." *Id.* This is true even where "an individual has committed even a very minor criminal offense in [an officer's] presence." *Id.* (quoting *Atwater v. Lago Vista,* 532 U.S. 318, 322 (2001).

Officer Frazer testified and Elaine Bochove admitted that she refused to allow him inside Conrad's bedroom to investigate. She also admitted that she fled to her bedroom and that she tried to bite him and resisted arrest. These undisputed facts establish probable cause for her arrest for interference with a police officer and attempted assault on a police officer. Thus, the arrest was legal and qualified immunity was also proper.

**Prejudice to the Remaining Claims Arising From the Directed Verdict**

We perceive plaintiffs' final argument to be that the claims that were submitted to the jury were prejudiced by the district court's order directing a verdict on the other claims in the case. Plaintiffs posit the issue as: "Whether the jury's verdict on the question of excessive force was so tainted by the removal of the other issues from their consideration that it must be vacated and the issue returned for a new trial and a new verdict." Aplt. Opening Br. at 3.

With good reason, plaintiffs offer no support whatsoever for this contention. Indeed, taken to its logical conclusion, this argument would write Fed. R. Civ. P. 50 out of existence, because it would mean that a district court could never direct a verdict on fewer than all claims in a case.

The judgment of the district court is AFFIRMED.


Entered for the Court


Michael R. Murphy
Circuit Judge